THOMAS BREEN, Respondent, v. THE ST. LOUIS COOPERAGE COMPANY, Appellant.

St. Louis Court of Appeals, May 17, 1892.

1. **Liability of Master to Servant:** DEFECTIVE APPLIANCE. When a servant is injured by a breakage in complicated machinery—in this cause it was occasioned by the breaking of the shaft of a planing machine—the doctrine *res ipsa loquitur* is not applicable.

2. ——: ——. Nor will the proof of the existence of a defect in the appliance in itself establish the right of recovery on the part of the servant against the master. It must further affirmatively appear, not as the result of bare conjecture but as legitimate inferences from the evidence, both that the defect was the proximate cause of the accident, and that the master knew or was chargeable with knowledge of it. And *held*, Biggs, J., *dissenting*, that the evidence in this cause was insufficient for that purpose.

*Appeal from the St. Louis City Circuit Court.*—Hon. Jacob Klein, Judge.

Reversed and remanded.

Kehr & Tittmann, for appellant.

A. R. Taylor, for respondent.

Rombauer, P. J.—The plaintiff recovered a judgment against the defendant for personal injuries caused to him by the breaking of a shaft of a planing machine in defendant's factory, where the plaintiff was employed as a laborer in working said machine. The only errors assigned by the appealing defendant are that the court refused to sustain its demurrer to the evidence at the close of plaintiff's case, and at the close of the entire evidence in the cause.

The alleged negligence on part of the defendant, which brought about the injury complained of, is thus stated in the plaintiff's petition: "That said machine and appliances therewith connected were at said time and for a long time prior thereto in a defective and dangerous condition, and unsuitable and unfit for the use to which the defendant was applying the same, as defendant, and its agent having charge for defendant of keeping same in repair, *well knew, or by the exercise of reasonable and ordinary care would have known before plaintiff's injury a sufficient time to have*

*averted plaintiff's injury by the exercise of ordinary care,* yet neglected to do so.''

"That said defects in said machine were that it was worn out and out of repair; *that the shaft was composed of inferior material and was broken and welded; that, owing to the worn and defective condition of said machine, the shaft and mandrel would run rough and wear out the Babbitt metal and make the shaft liable to break and give way,* as also the other parts of said machine; *that, owing to said defective condition of said machine, the shaft thereof broke and gave way as aforesaid, and plaintiff was thereby injured as aforesaid.*''

I have italicized those parts of the plaintiff's petition charging the negligence which it was incumbent upon him to substantiate by evidence as a condition precedent to his recovery, as it always has been the common law that the master is not an insurer to his servant of the safety of the machinery by him employed, but is only held to reasonable care in its selection and inspection.

The plaintiff testified that he had worked at this work for the defendant some time before, then quit, and then re-entered the defendant's employ on the fifth day of June, 1890, and continued at this work for the space of one week until the twelfth of June, when the accident happened; that the defendant's foreman in charge of this machinery was around there many times every day, oiled the machine when necessary, and babbitted it when necessary, and that two or three days before the accident happened the machine was taken apart and put together and re-babbitted again. The plaintiff was an ordinary laborer seventeen years of age, and there was no pretense that he knew anything about complicated machinery, or the bearing of one of its parts upon another. It appeared in his cross-examination that he

did not even know what a journal meant. He testified that the machine ran hot from the fifth to the twelfth of June, while running. When asked what he meant by running hot, he answered, "running hot is when the boxes run hot like, the shaft runs around so fast it don't get enough oil like, or something like that, I guess." At another time he testified "that the boxes run hot, the Babbitt all wore out, and the shaft went up and down, and loosened the screws."

Another witness for the plaintiff testified that the shaft would work up and down and have an eighth of an inch play in the box, and that the screws would get loose once in a while; that the shaft, when the accident happened, was not broken but was split. The same witness testified on cross-examination that the same machine was used continuously by the defendant while he remained in its employ for a year after the accident happened, and until he, the witness, quit. Another witness for the plaintiff testified that whenever the shaft was running hot the screws would get loose, but that there was always somebody around watching the machine, and tightening the screws and oiling it. There was also testimony on part of plaintiff's witnesses that screws in other machinery in the shop would get loose from time to time, and that the defendant's foreman would tighten them whenever it became necessary to do so. The plaintiff's witnesses, as far as their ages appear, were boys of between sixteen and eighteen years of age. Not one of them testified what, if any, bearing the fact that the boxes ran hot had on the strength or stability of the shaft, or what effect the play room which the shaft had in the journal had in affecting the safety of the shaft itself. There is no evidence that it is unusual for boxes, in which a shaft revolves with great rapidity, to get hot, or that it is unusual for screws to get loose. There is no evidence

that the machine was old or worn, or not reasonably fit for the uses to which it was put. The part of the machine which broke was in court, so that the bearing of one of its parts upon another could be readily explained, but no explanation whatever was furnished; nor did it appear that any of the witnesses called for the plaintiff was competent to furnish any explanation on the subject or cause of the accident.

The defendant called a number of witnesses, who testified in substance as follows:

James M. Chambers testified that he was a machinist of twenty-two years' experience, and was superintendent of the defendant's works when the accident occurred; that the shaft in question was a steel shaft, and was ordered by him in February, 1889, to be manufactured out of the best Bessemer steel, and had been in use for one year and a half when the accident happened; that the Babbitt metal used in the works was number 1; that boxes in which shafts run with great velocity are apt to get hot, particularly when newly babbitted, and often because not oiled enough; that, when they get so hot as to run out the Babbitt metal, they are re-babbitted; that, when this shaft was taken out, after breaking, the Babbitt metal in the boxes was found perfectly smooth, and the shaft bore no indications whatever of having run rough in the boxes. This same witness testified that the running of the shaft loose in the boxes would not affect its breaking outside, and, even if it did, that was not the cause of the breakage; that it is a common occurrence in all machinery bolted together with screws, for the screws to get loose occasionally; that this machine did its work at the time of the accident, and could not have done it if it had run rough, as testified to by plaintiff's witnesses. The same witness testified that a little play in the shaft would have no effect whatever

on the strength or weakness of the shaft, and that after the broken shaft had been replaced, the same machine, with but one slight change which did not affect the cause of the breakage, had been in continual use in the defendant's shop up to the date of the trial, which was nearly one year after the accident.

On cross-examination of this witness he was asked whether the repeated heating and cooling of the shaft would have a tendency to make it brittle? He answered no; that the shaft could not be run hot enough in the boxes to injure its quality. On re-examination he testified that the shaft, at the place where it broke, was slightly bent; that it then appeared that it was welded there by a lap weld,—a fact which could not be discovered by inspection; and that it showed no discoloration whatever,—whereas shafts heated to a dangerous degree always show discoloration. He also testified that, if the shaft had bobbed up and down an eighth of an inch, it would have been impossible for the machine to perform its work, and that that play would have been too much.

Wm. E. Lee testified that he was foreman of the machines of the defendant's works and a machinist of from fifteen to twenty years' experience; that he observed the working of this machine for five years, and that it worked well; that a few days before the shaft broke the machine was thoroughly overhauled and re-babbitted, and he saw it from that time on daily, and almost every hour until the time of the accident; that the machine was running well, and would not run more hot than machinery usually does; and that when the shaft was taken out the babbitting was perfect and the shaft smooth and showed no discoloration whatever. In other respects the testimony of this witness was the same as that of the preceding one. On cross-examination the witness testified that screws getting loose was an

incident (probably meaning indication) that the machine wanted to be overhauled; that, during the month preceding the accident, it was reported to him that the machine was out of order, and that this was when it needed re-babbitting and was in fact re-babbitted. He also testified that a machine that ran hot within a few minutes after it was started up was not in good order, and that a flaw in a shaft might be discovered by dropping heavy weights on it, but that such tests are made by the manufacturers of the shaft and not to his knowledge by any parties that use it; that the shaft revolved at the rate of from thirty-five hundred to four thousand revolutions a minute; that when the machine was re-babbitted, which was a few days before the accident, he wiped off the oil from the shaft and examined it carefully, and that it did not disclose any defects; and that, when screws, nuts or bolts get loose, he replaces them with new ones.

E. D. Meyer testified that he was a civil and mechanical engineer of twenty-three years' experience and was scientifically educated in the profession; that he was familiar with machinery and its construction; that a steel shaft would be affected by a temperature of six hundred degrees so as to become slightly weaker, and would bend at between seven hundred and eleven hundred degrees, and would have to be about one thousand degrees hot to become pliable and bend; and that Babbitt metal would melt according to its different composition between five hundred and seven hundred degrees. This witness further testified that heat sufficient in degree to bend or break a shaft would discolor it, and that an absence of discoloration would show that there was not sufficient heat to either break or bend the shaft. This witness further testified that a weld properly made does not affect the strength of the shaft, and would not disclose external evidence that the

shaft was welded.   On cross-examination this witness testified that the steel used in machinery shafts is one which is known as mild steel, capable of being bent even when cold, and where such mild steel is subjected to repeated heating and · cooling it might affect its strength but not necessarily.

C. S. Brown testified that he was a manufacturer of wood-working machinery, and that he had furnished the shaft in question to the Felber machine works of whom the defendants ordered it; that he had been engaged in this business for thirteen years; that the shaft was Bessemer steel of good material.   On cross-examination the witness testified that the shaft had no weld in it when it left his works, but that a weld, if well made, would not affect its quality.

Ewald Koerner testified that he had been a machinist for seventeen years and was foreman of the Felber machine works; that he got the shaft from the preceding witness, and welded a piece onto it because it was too short; that the weld was good work and was not visible, and that he did not inform the defendant that the shaft was welded.   The witness also testified that his company furnished the Babbitt metal to the defendant, and that it was the usual Babbitt metal used for high speed, and is what is known as second best, first class never being used for that purpose.   On cross-examination this witness testified that shafts are apt to break at the weld on account of the different grain of the iron or steel, that the grain runs a different way at the weld, and it is liable to give way there first.

Fred Bowman testified that he was the blacksmith at the Felber machine works, and that the shaft was returned to him immediately after it was broken; that the shaft showed no indications of having been overheated;

that, in the place where the weld had been, he saw a black spot caused by carbon or dirt which might have caused an imperfect weld in the first instance, but that he could not tell whether the weld was the cause of the breakage, but thought not; that the shaft was partly broken and partly split at the weld immediately outside of the journal; that welding shafts for machinery is usual and done every day; and that he could not tell what was the cause of the breaking of the shaft, because he did not see the machine in motion when it broke.

George Freiner testified that his business was work around machinery at defendant's works; that he saw the machine in question immediately after it was overhauled, and from that time on until the accident occurred; that the machinery worked first rate; that he tightened the screws on the machine about an hour before the shaft broke, at plaintiff's request. On cross-examination this witness stated that he did tell the boss that the machine was in bad order, but denied that he said so after the machine was overhauled the last time, a few days before the accident. As regards the time at which he told the boss this fact, he was impeached by conversations out of court by two witnesses called in rebuttal by the plaintiff, but the court at the same time properly ruled that this rebutting evidence was admissible only for the purpose of impeaching the witness, and not as original evidence to charge the defendant in any manner.

This evidence, and evidence on part of the two of the managing officers of the defendant corporation, to the effect that they had no knowledge that the shaft was welded, was all the evidence in the case.

This being all the evidence in the case, I shall proceed to the discussion of the question, whether it shows any *prima facie* right of recovery on part of the

plaintiff, taking the plaintiff's evidence alone, or whether it does so taking the plaintiff's evidence and supplementing it by that of the defendant. I concede at the outset that, even if the plaintiff's evidence were insufficient for the purpose of showing defendant's liability, yet it might be helped out by that of the defendant. I also concede that the verdict must be upheld if the evidence of the plaintiff, or that of both parties together, shows a state of facts from which the *inference* is logically admissible, that the defendant was guilty of negligence which brought about the accident complained of.

That the basis of the action is negligence is an elementary proposition, and, hence, I will not discuss it. The negligence charged in the petition is, *first*, that the shaft was composed of an inferior material. Of this there is absolutely no evidence whatever. As far as there is any evidence on the subject it tends to show that it was composed of the best Bessemer steel. *Second*. That the shaft was broken and welded. There is no evidence whatever in the record that the shaft was broken. The uncontradicted evidence on that subject is that the shaft was a new shaft when put in a year and a half before the accident, and had never been broken prior to the accident. On the question of welding, the uncontradicted evidence is that the defendant did not know and could not, by the exercise of any diligence, have known that the shaft was welded, and, moreover, that shafts are continually welded and a well welded shaft is as good as a new one, and that, even if the defendant's agents had known that the shaft was welded, they could not by the exercise of the utmost care have determined whether the weld was perfect or imperfect, because they could not look into the interior of the weld. These two charges of negligence must, therefore, be rejected at once, as having

no evidence whatever to stand upon. This, then, leaves the third charge of negligence as the only one to be considered.

The third charge is that, owing to the worn and defective condition of the machine, the shaft and mandrel would run rough and wear out the Babbitt metal and make the shaft liable to break, *and that owing to said defective condition of said machine the shaft did break and injure the plaintiff*.

On the first part of this specification there is some evidence. The witnesses for the plaintiff do testify that the shaft at times did run hot and rough and wore out the Babbitt metal, and that the shaft did go up and down, which loosened the screws. But there is no evidence for plaintiff that this running of the shaft had any effect whatever upon its safety, much less that the effect upon its safety was one which the defendant was bound to foresee and guard against in the exercise of that ordinary care with which the master is chargeable. If proof of the latter fact *cannot* be made by direct evidence, on what conceivable theory is the master chargeable with the negligence? He is not an insurer of the safety of the machinery. Conceding that a defect in one part of the machinery existed, how was he bound to anticipate its probable effect upon another part, and guard against it, when the plaintiff is incapable of showing that it had any such effect, or that it could be guarded against by the exercise of reasonable care, or in fact by any care?

It was for the plaintiff to trace the cause of the accident to the defendant's negligence, and not for the defendant to show the cause of the accident. The defendant's evidence on that head has certainly no tendency to make a case for the plaintiff. Even the first part of the specification is rebutted by the defendant. Its witnesses uniformly testify that the shaft showed

no discoloration by heat after the accident; that the Babbitt metal in the journals was in perfect condition after the breakage; that screws will get loose in all machinery which is bolted, but that, when they got loose on this shaft, they were refastened or replaced by new screws and bolts; that, if the shaft had worked as the plaintiff's witnesses testified, the machine could not have done its work satisfactorily, and that it did do its work satisfactorily not only up to the date of the accident, but for a period of one year thereafter up to the date of the trial, being identical in all its parts. There is no evidence whatever that the defendant's servants or agents had any reason to anticipate a danger from the condition of this machinery to anyone. On the contrary, very persuasive evidence of the fact that they had not is to be found in the evidence, given by the plaintiff's witnesses and emphasized by that of the defendant, that the directing officers of the defendant were daily around this machine, and sometimes repeatedly during the day in close proximity of this revolving shaft, and that one of such officers stood in the immediate vicinity of the plaintiff when the accident happened.

In *Jones v. Yeager*, 2 Dillon, 68, the injury was the result of a boiler explosion. Judge DILLON, after briefly stating the well-known rules of law governing the master's liability in such cases, charged the jury as follows: "In the application of these principles to the evidence you will first inquire whether the boilers in this case were unsafe or unfit for use; and, if so, whether the defendant knew it, or as a reasonable man, having a due regard for the safety of his employes, ought to have known it; for, if he ought, his neglect in this respect would be equivalent in imposing liability to actual knowledge; *and in the next place you must inquire, and in order to hold the defendant liable*

*must find from the evidence, that this defect was the direct and immediate cause of the accident, without which it would not have happened;* and, if you thus find, then the defendant would be liable.'' That charge was given in a case where there was ample evidence tending to show that the boiler which burst was weak and worn, and expert evidence tending to show that it burst owing to such weakness. This clearly shows that the rule of *res ipsa loquitur* cannot be applied with any sense of reason to a case of complicated machinery, nor can the jury, from the mere fact that some defect exists in some part thereof, conjecture not only that such defect was the direct and immediate cause of the accident, but also that it was the duty of the defendant to foresee such conjectural result and guard against it. The employer fulfills his duty by guarding against the probable result of defects, even if such defects are shown. Holding him responsible for conjectural results shifts his liability from the ground of negligence to that of insurance.

I have examined many cases on this subject, but find none sufficiently analogous in its facts to the present case to furnish a precedent of any value. Touching the law there is very little difficulty, but touching its application to the particular facts in this case the difficulty is great. That it is not for the defendant to account for the accident on a theory consistent with due care, but for the plaintiff to account for it on a theory inconsistent therewith, all the cases concede. That such theory must not rest upon bare conjecture, but must rest either upon direct proof, or upon proof of facts establishing a direct and immediate connection between the defects and accident complained of by logical inference, is equally conceded.

The cases which probably come nearer in their facts to those of the present case are *Searles v. Rail-*

*road*, 101 N. Y. 661, and *Dobbins v. Brown*, 119 N. Y. 188, in both of which verdicts were set aside on appeal as resting not on legitimate inference, but on bare conjecture. In the first the cause of the injury was a cinder which had lodged in the defendant's eye. Judge EARLE, in delivering the opinion of the court, said: "Where the fact is that the damages claimed in an action were occasioned by one of two causes, for one of which the defendant is responsible, and for the other of which it is not responsible, the plaintiff must fail if his evidence does not show that the damage was produced by the former cause, and he must fail also, if it is just as probable that they were caused by one as by the other, as the plaintiff is bound to make out his case by a preponderance of evidence. The jury must not be left to mere conjecture, and a bare possibility that the damages were caused in consequence of the negligence and unskilfulness of the defendant is not sufficient." In the second case the cause of the accident was the precipitation of the plaintiff's intestate from a bucket while descending a mine. The evidence showed that the cable attached to the bucket was broken after the accident, but there was no evidence how it came to be broken. RUGER, C. J., in delivering the opinion of the court, said: "The trial court, in its charge to the jury, authorized them to infer that the accident might have happened from the accidental stoppage of the dummy yoke or follower at some point in the course of its descent, and its sudden fall thereafter, from a great distance, on the bucket. Any inference that the accident happened in the manner suggested would, it seems to us, have been substituting conjecture for proof, and violates the rule requiring proof always to be made the basis of recovery."

In *Callahan v. Warne*, 40 Mo. 136, Judge HOLMES says: "Negligence is something invisible, intangible,

and, for the most part, incapable of direct proof, like sensible facts or physical events. It is, in general, a matter of inference from other facts and circumstances, which admit of direct proof, and which may raise a presumption of the truth of the main fact to be proved. These facts and circumstances must be such as would warrant a jury in inferring from them the fact of negligence by reasoning in the ordinary way, according to the natural and proper relation of things and consistently with the common sense and experience of mankind." In *Smith v. Railroad*, 37 Mo. 292, the same judge says: "It is not enough that a part of the facts involved in the injury are made to appear. The whole issue must be proved and the burden of proof is upon the plaintiff. If he failed to prove the whole issue, he comes short of making out a *prima facie* case, and the jury should be instructed to find a verdict for the defendant."

The breach of duty upon which an action is brought must be not only the cause, but the proximate cause, of the damage to the plaintiff. *Hudson v. Railroad*, 101 Mo. 34. After examining the evidence very carefully, I cannot find that there was any substantial evidence offered by the plaintiff that the alleged deficiency in the journal had any tendency to cause the breaking of the shaft, much less of the further fact that the defendant was bound to foresee that result and guard against it.

With the concurrence of Judge THOMPSON the judgment is reversed and the cause remanded. Judge BIGGS dissents.