DeMAET, Respondent, v. FIDELITY STORAGE, PACKING & MOVING COMPANY, Appellant.

**St. Louis Court of Appeals, October 16, 1906.**

(Opinion by Eugene C. Tittman, Special Judge.)

1. **DEATH CLAIM: Prima Facie Case.** In an action for damages to plaintiff on account of the death of his wife caused by a collision with the defendant's buggy in a street, the evidence is examined and held insufficient to support a verdict for the plaintiff.

2. ————: ————: **Physical Facts: Substantial Evidence.** Where the testimony of one witness in such case tended to show negligence on the part of the defendant which would warrant a recovery, but such testimony was contrary to the physical facts proven by plaintiff's evidence in the case, the testimony of such witness should be disregarded.

3. ————: ————: **Expert Testimony.** Where an expert witness gives an opinion in answer to a hypothetical question, the opinion must stand or fall with the existence of the facts upon which it was predicated, and if the matter assumed in the hypothetical question is not true, the opinion is worthless and is insufficient to make out a prima facie case.

4. ————: ————: **Reasonable Certainty.** In an action on a death claim, where the evidence showed that the death might have resulted from other causes besides the accident which formed the basis of the suit, the burden was on the plaintiff to show with reasonable certainty that the death was caused by the negligence alleged, and if it is left to conjecture, the plaintiff fails to make out a case.

(Dissenting Opinion by Goode, J.)

5. ————: ————. In an action for damages to plaintiff on account of the death of his wife caused by a collision with the defendant's buggy in the street, the evidence is examined and held sufficient to submit to the jury the question whether the defendant was negligent in striking plaintiff's wife and whether the collision was the cause of her death.

Appeal from St. Louis City Circuit Court.—*Hon. John W. McElhinney,* Judge.

REVERSED.

*Jeptha D. Howe, A. E. L. Gardner* and *Alphonso Howe* for appellant.

*John A. Talty* for respondent.

EUGENE C. TITTMAN, S. J.—After stating that defendant is a corporation, organized under the laws of this State, that Morgan street and Broadway were and are, open public thoroughfares in the city of St. Louis, that plaintiff was lawfully wedded to Predentia DeMaet, on April 5, 1887, and continued to live with her as her husband until the date of her death, the petition alleges:

"Plaintiff further states that on or about the 4th day of May, 1903, while plaintiff's said wife, Predentia DeMaet was walking in a southwardly direction across said Morgan street on, or near, the crossing on the west line of said Broadway, one, defendant's agent, servant and employee in charge of and driving its horse and buggy carelessly, negligently and unlawfully drove said horse and buggy against and upon said Predentia De-Maet, with such force as to throw her violently to the ground, causing a great and sudden shock to her nervous system, and cutting, bruising, wounding and seriously internally injuring the said Predentia DeMaet, causing her to become sick and sore and from the effect of which she finally on or about the 20th day of May, 1903, died.

"Plaintiff further states that Predentia DeMaet, was at all of said times in the exercise of ordinary care, and that her death was caused by defendant's said servant's negligent, careless and unlawful acts in driving said horse and buggy against and upon her and causing the said injuries as aforesaid."

Then follow allegations of damages and prayer for judgment.

The answer to the petition is as follows:

"Now comes the defendant, and, for its answer to plaintiff's petition herein, denies each and every allegation therein made and contained.

"Further answering, defendant says that if Predentia DeMaet sustained any injuries they were directly and proximately caused by her own carelessness and negligence, in that she carelessly and negligently walked into and against said horse without paying the slightest attention to where she was going.

"Further answering defendant says that the cause of the death of Predentia DeMaet was due to fat and enlarged thyroid gland and degeneration of the heart, liver and kidneys, and many other natural causes contributed thereto, and not as alleged.

"Wherefore, having fully answered, defendant asks to be hence discharged with its costs."

A reply was filed, denying the new matter in the answer.

A trial before a jury resulted in a verdict and judgment thereon, for the plaintiff, from which after an unsuccessful motion for a new trial, the defendant appealed to this court.

At the close of the plaintiff's case, the defendant offered an instruction in the nature of a demurrer to the evidence which was overruled. An instruction offered at the close of the whole case, to find for the defendant was likewise overruled.

Defendant having duly preserved the point, it becomes necessary to review the evidence taken as a whole. [Hilz v. Railroad, 101 Mo. 36, 13 S. W. 946; Weber v. Railroad, 100 Mo. 194, 12 S. W. 804, 13 S. W. 587; Hite v. Railroad, 130 Mo. 1. c. 141, 31 S. W. 262, 32 S. W. 33.]

The evidence for the plaintiff tends to show that the deceased was forty-one years of age, and up to May

4, 1903, was apparently a strong, healthy woman, the mother of eight children (four living and four dead); that on May fourth she, with a basket on her arm, accompanied by her eleven-year-old daughter, stepped off the sidewalk on Morgan street, in the city of St. Louis, on to the pavement where Morgan street intersects Broadway, and was struck in the left side by the end of a buggy shaft, knocked down and injured; that she and her daughter were then taken into the buggy by the driver and driven south to Market street, where they took a street car and went to their home in South St. Louis.

The plaintiff testified that when he went home on May fourth, after his day's work was done, he found his wife in bed "wrong in her mind," unable to give any account of the accident; that she continued in this condition, and on May 16, 1903, he had her taken to St. Anthony's Hospital at Chippewa street and Grand avenue, where she died on May nineteenth, that before being sent to the hospital, she was treated for her injuries by Dr. Collasowitz.

Louis Margulis, the only witness in the case, who gave any testimony tending to show that the deceased was run into or struck by defendant's buggy, testified that at the time of the accident he was sitting on a trunk in the front of a store, across the street, on the northeast corner of Broadway and Morgan street, from which point, he saw the accident; that when deceased stepped out a few feet from the north curb on Morgan street, the buggy came around the corner going west on a full trot and the end of the right shaft of the buggy struck her on her left side, and she fell down on her hands and face "all crouched up," and the buggy had to be backed to get her out; that the buggy was a storm buggy, with all the curtains down except the front one and was coming from the north on Broadway at a brisk trot. This witness confessed that he signed the following statement:

"St. Louis, Mo., June 22, 1903.

"I, William Louis Margulis, state before Officer Dineen that I witnessed accident at northwest corner of Broadway and Morgan on May 4, 1903, at 11 or 11:15 A. M., and I witnessed buggy stop for street car going south on Broadway, then started west on Morgan. Saw lady run into front wheel of buggy and fall down, apparently by her own carelessness.

"Louis Margulis."

But in explanation, witness said he did not read the statement and signed it at the request of a police officer, for the protection of the officer. Two police officers present when he signed the statement, testified that he read it and knew its contents when he signed it.

Lawrence A. Steinberger testified that he did not see the accident, but heard the deceased scream and looked and saw her down under the wheel of the buggy; that the wheel was not on her, but she was down under the wheel, "doubled up, more on her right than on her left side, and with her face downward;" that the driver backed the buggy and she was assisted to her feet and into the buggy and she and her daughter were taken away by the driver.

Emma DeMaet, the daughter, testified that her mother was ahead of her and when they came to the corner of Morgan street and Broadway, as her mother was walking across the street, a buggy came along at a fast trot and knocked her down "by the wheel;" that some men picked her up and the driver took them to Market street, gave her mother a dime and they got on the street car and went home and her mother went to bed; that her mother did not talk to her at all on the way home. On cross-examination, witness stated that she did not see the buggy before it came in contact with her mother and could not tell whether her mother walked into the buggy, or the buggy ran into her; that she was looking at the fish market and the first she noticed her mother

was down; that they were going to take a car and go
home and were trying to catch a car that had just pass-
ed.

Edwin E. Goebel, the attorney who brought the suit
but afterwards withdrew from it, testified that he sent
for Charles F. Betts, president of the defendant company
to come to his office, and in a conversation had there with
Mr. Betts, the latter stated that Lawler (the driver of
the buggy), was in the employ of the company on May
4, 1903, and had been up in North St. Louis on that day,
taking orders and giving bids to people for the storage
of their goods, and was on his way west on Morgan
street when the accident happened, and that the horse
and buggy belonged to the company.

Dr. Collasowitz testified that he attended the de-
ceased professionally from the 4th to the 16th of May,
1903, when she was sent to the hospital after which he
did not again see her; that although he tried several
times to have his patient sit up, she was unable to do so,
but felt faint; that she could not sit up and if she was
not supported, she fell back on her pillow; that at times
she seemed to be better and at times she was worse; her
condition changing from day to day; that he visited her
fourteen times; found no lesions on the body of the de-
ceased—no evidence of external or internal physical in-
juries. He further testified that he did not know what
caused the death of the deceased, but from the symptoms
and from the statement of the injury received by her, he
thought that she probably had hemorrhages of the
brain, but could not give an opinion whether she died
of shock or hemorrhages alone.

Charles F. Betts testified for defendant, that Goe-
bel's testimony, in regard to the conversation with him
at his office (Goebel's office) was wholly untrue, that
Goebel called him to his office and tried to induce him
to give him seventy-five dollars to drop the suit, but he

told Goebel he would not give him fifteen cents; that he never heard of the accident until told of it by Goebel. Witness testified that while Lawler was hired by the company by the month, he was not at work for the company on May 4, 1903; that there was a strike of the teamsters on at that time and the company was not doing any business; that Lawler was driving the horse and buggy on his own private business. Both the secretary of the company and Lawler testified that on account of the strike, the company had no teams out on May fourth and that Lawler was going about in the buggy on his private business and not for the company.

Several witnesses to the scene testified that the shaft of the buggy did not touch the deceased, but she ran against the buggy and crouched down between the wheels.

Lawler testified that he was driving west from Fourth street on Morgan, with all the curtains of the buggy up, and when he reached Broadway, a car was going south and he stopped until it passed; that he then drove across Broadway in a walk and was on Morgan street, about three feet from the curb when the deceased stepped down "lively" from the sidewalk against the front wheel of the buggy and crouched down; that he assisted her into his buggy and drove here and her daughter to Market street, and would have driven them home but the deceased said she preferred to go on the street car and he gave her a dime to pay fare home; that the police officer present asked her through her daughter (deceased could not speak English) if she was hurt, and she said that she was not, and when asked if she wanted Lawler arrested, she said "No."

Dr. B. H. Grandwohl testified that he was an autopsy physician in the coroner's office in May, 1903, and held an autopsy on Predentia DeMaet for the coroner's office, in the presence of Dr. Dean, the attending physi-

cian in the hospital. In regard to what he found, witness testified as follows:

"I found a medium-sized woman, weighing one hundred and seventy-five or two hundred pounds. Examined her very carefully for signs of injury of inflammation, that is, on the external surface of the body. Saw nothing indicative or anything on the inspection of the body; but further performing the autopsy, I first examined the head and brain and found thickening of the membranes, the covering of the brain proper. That is a chronic condition which has existed for some time. 'I found nothing else, no fracture of the skull, no hemorrhage of any kind. I examined the organs of the neck and I found an enlargement of the thyroid gland.

"Q. Explain to the jury what that gland is, Doctor? A. It is the body which lies on either side of the neck alongside of the windpipe. In a normal healthy condition it is so small it can't be felt, but it occasionally becomes the seat of disease, and in this instance, it had attained a large size, so that the neck was bulged out. In cutting this open, and examining it, I found it was degenerated. There were large cavities in it and these cavities were filled with a glue-like material, what we call a degeneration of the gland. Going further downward, I examined the heart and lungs and I found that there was a bad degeneration of the heart—that there was a filling up of one lung with fluid, which had occurred in the last stages of life, which often occurs before death; what is called edema of the lungs. There were also some blood spots an the inner lining of the heart. An examination of the intestines showed nothing abnormal: The examination of the kidneys showed degeneration—a chronic fatty degeneration. Examination of the liver showed a fatty liver; that is, the liver was filled up with fat. There were no signs of injury either in the chest or in the abdomen, no hemorrhages—no broken ribs—nothing to indicate any injury or any violence.

The examination then was complete by examining the genito-urinary organs, the uterus, womb and the ovaries. I found a chronic inflammation of the interior of the womb and also a degeneration of the ovaries. The spleen was slightly enlarged.

"The chronic condition of the membrane of the brain thickening probably had the same cause which had caused the degeneration of the other organs. The time consumed in that thickening was a long time. I should say at least six months or over. It is a very slow process, and takes some time for it to form. It is a condition which is seen in senility. I would say it would take at least six months or a year for a condition like this to arise. There are a variety of causes that might have induced this condition. Premature age. She might have had some previous disease, which had been followed by chronic inflammatory degeneration, causing this, but not being acquainted with her previous condition, I can't tell the cause of it. I found no hemorrhages of the brain.

"A physicial shock, such as you are speaking of, a condition whereby the patient suffers some physicial violence without any laceration of the body, is caused by jarring of the nervous system, and if it is sufficient enough to produce death, death will occur in the first twenty-four or forty-eight hours, because death is produced by jarring of the vital centers in the brain and death willl occur very shortly after the injury, but if it isn't sufficient the patient gets well.

"This thyroid gland was enlarged on either side of the windpipe, the enlargement protruded out like that, say about half an inch further forward. You could hardly see the lines of the neck. It was a chronic condition. In order that the gland should enlarge to that extent and become broken down and filled with matter like this, it would be anywhere from a year up. Probably had been going on for several years. The cause of death in

this case was disease of the thyroid gland, fatty degeneration of the heart, liver and kidneys."

Dr. Dean was the physician at the hospital and witness was an official of the coroner and had nothing whatever to do with the case outside of the autopsy. Witness said that he had had a great deal of experience in judging weights of dead persons, and, on cross-examination, testified as follows:

"These particular hemorrhages were small spots like you might compare them to freckles on a man's face, only they were blood accumulations—small escapements of the blood under the lining of the heart and into the thyroid gland. There is a certain amount of fat about everybody's heart, but the fat I describe in that heart is not a layer of fat. There is a small amount of fat covering a certain part of the heart, but degeneration of fat into the heart muscle is where the wall of the heart becomes filled up with fat—globules, and loses its muscular character.

"Q. What do you say when a woman who had never shown any signs of ill health—done her own washing for a family of five or six, and showed signs of good health—never had the attendance of a physician, forty-one or forty-two years old, was struck by a horse and buggy and thrown down to the ground—to the pavement—granitoid pavement, taking to her bed after she arrived home on the fourth day of May and never able to leave her bed after that; was in a semi-conscious condition, delirious part of the time, rapid pulse and slow pulse alternating, and died on the nineteenth or twentieth day of May, what would you say the cause of her death was. A. I couldn't say, because I don't believe such a case could exist."

On re-direct examination witness testified that in answer to the hypothetical question put by Judge Talty, he meant to say that he did not believe a normal individual who was struck in that manner and received a shock, that shock could last for that length of time; in other

words, it would either pass away or cause death before that length of time would elapse, that "if the shock received was sufficient to cause death the patient would not be all right in a buggy, get out and take a street car and ride two or three dozen blocks, and get off the street car and walk home. The shock is supervised by the symptoms immediately. You are liable to get hemorrhage of the brain and walk around then, but with a shock you get the symptoms immediately from the shock. She had a number of chronic diseases, any one of which was sufficient to produce death."

Dr. John Dean testified that he was a practicing physician, and in May of 1903, had charge of St. Anthony's Hospital and attended Predentia DeMaet. "She came to the hospital May the sixteenth. Do not remember seeing her oftener than two or three times, but the patient came in and complained of pain in the left hypochondrium region, that is, just in the left side, and naturally we always get a history with all the cases that come in the hospital, and I heard she had been injured by a carriage or buggy of some kind. I examined the side very carefully and the body and hands and legs and in fact, examined her entire body and found no signs of any acute injury. The next day the pulse was very much increased, in fact she was in a moribund condition. The large thyroid gland was absolutely inactive. Could not sign the burial permit, because I could not find any connection with what caused her death. Was present at the morgue and found quite a number of conditions, either one of which was sufficient to cause her death. The condition of the thyroid gland was much as you would find in a malignant thyroid. The muscles of the heart would indicate heart failure, but I am not so certain about that. She had also an atheromatic condition (thickening in the blood vessels). It is what they call cirrhosis. Either of three conditions named were sufficient to have caused her death. My opinion is that

she died possibly through a malignant condition of the thyroid gland—an exophthalmic goiter. If she had died from the shock, she would have died shortly after the time she received the shock, and a lesion which is sufficient to produce connection with shock would show itself on post mortem. There was no hemorrhage in the brain whatever."

On cross-examination, witness testified that he was not very well able to diagnose the case without getting the coroner's office to assist him, and did not know at the time that the enlarged gland had anything to do with her death; that he sent for the coroner to ascertain the cause of her death; that she complained of pain on the left side just below the ribs; that she was not delirious the first day but was more or less so on the second day; that she did not complain of pain in the back of her head.

The foregoing is substantially the evidence in the case and from it, I am forced to the conclusion that it shows no right of recovery on the part of the plaintiff, either taking plaintiff's evidence alone or supplementing it by that of the defendant, and that, hence, the instructions hereinbefore referred to should have been given.

As before stated, plaintiff's witness Margulis, is the only witness in the case who gave any testimony tending to show that the defendant's buggy struck the deceased at all, while on the other hand, the great weight of the evidence shows that on her anxiety to reach a southbound car, the deceased herself, ran into the wheel of the buggy.

But Margulis' testimony is to the effect that when deceased had stepped out a few feet on Morgan street, the horse and buggy going at a full trot, a brisk trot, the end of the shaft struck the deceased in her left side with sufficient force to knock her down on the granite street. The testimony of all of the physicians, for plain-

tiff and defendant, is to the effect that there were absolutely no lesions to be found on the body, absolutely no evidences of external or internal physical violence.  It is, to my mind, simply incredible, against all common human experience, against all physical facts, that the end of a shaft attached to a buggy, drawn by a horse, going at a full, brisk trot, should strike a woman in the left side, with force sufficient to throw her on a granite-paved street, and with force sufficient, as plaintiff claims, to cause her death, and yet not leave on the body the slightest sign of violence.  Such testimony should be disregarded by both courts and juries and no probative force should be given to it.  [Payne v. Chicago & Alton R. R. Co., 136 Mo. 562, 38 S. W. 308; Nugent v. Kauffmann Milling Co., 131 Mo. 241, 33 S. W. 428; Weltmer v. Bishop, 171 Mo. 1. c. 116, 71 S. W. 167.] As plaintiff's own evidence demonstrates that the alleged fact on which he predicates his right of action could not exist, it cannot be said, that the testimony of one of the witnesses that such fact does exist is any substantial evidence thereof.  [Deane v. Transit Co., 192 Mo. 575, 91 S. W. 505.]

Again the mere concurrence in time of two facts, as in this case, the supposed alleged injury and that deceased took to her bed shortly thereafter, does not legitimately give rise to the inference that one is the result of the other.  It is at most a bare conjecture (Smilee v. St. Bernard Dollar Store, 47 Mo. App. 406), and plaintiff's expert witness, Dr. Collasowitz does not make out plaintiff's case in that respect.

He frankly states that he does not know what caused the death of Predentia DeMaet and in light of the developments from the subsequent autopsy made of the body of the deceased, it is not at all surprising that he does not.  He gave it as his opinion, based upon hypothetical facts of which he had no knowledge, that the deceased came to her death either by reason of a shock

or hemorrhages of the brain, either the result, however, of the alleged and supposed physical injury.

The opinion being hypothetical, must stand or fall, with the existence of the facts upon which it is predicated, and as the matter assumed was not true or did not exist, the opinion is worthless.   [Smart v. Kansas City, 91 Mo. App. 586.]

Moreover, the autopsy demonstrated to a certainty that there were no hemorrhages of the brain and the testimony is uncontradicted that if the deceased had received a shock from such an injury as alleged and claimed, sufficient to have caused her death, she could not have lived from the 4th to the 19th of May, a period of fifteen days, but must, if fatal, have succumbed within a period of forty-eight hours, at the utmost, after the receipt of the injuries.

The physical facts, also developed by the autopsy, conclusively show that the deceased did not come to her death by any injury or shock she may have received on the 4th of May, 1903.   That autopsy showed, beyond question, that deceased was afflicted with at least three chronic diseases, of long standing, either one of which was sufficient to cause her death.

Even assuming that deceased was struck by defendant's buggy and that the injury received might have been sufficient to cause her death, which I do not believe, the record here presents a case where death may have resulted from either of four causes, for one of which and not for the others, the defendant would be liable.   In such case, plaintiff must show with reasonable certainty, that the cause for which defendant is liable produced the result and if the evidence leaves it to conjecture, the plaintiff must fail.   [Smart v. Kansas City, 91 Mo. App. 586; Breen v. St. Louis Cooperage Co., 50 Mo. App. 202; Searles v. Railroad, 101 N. Y. 661.]

Based upon the same assumption, and allowing to the limit, the rule of legitimate inference of consequences

following an injury, the most that can be said for the plaintiff is that the whole evidence taken together shows that death resulted either from the injury received from the buggy, or from one of three chronic diseases of long standing, but which of these conditions was the cause can only be a matter of conjecture. For the foregoing reasons, in my opinion, the judgment of the lower court should be reversed.

*Bland, P. J.,* concurs, *Goode, J.,* dissents.

### DISSENTING OPINION.

GOODE, J.—Part of the testimony which seems to me to present a case for the jury is as follows. The daughter of the deceased, who was with her when the accident occurred, swore:

"Q. When you came up to the crossing at Broadway — the west crossing of Morgan street, at Broadway, was she (the mother) ahead of you or you ahead of her? A. She was ahead of me.

"Q. Now what happened there? A. She was walking across the street and a buggy came in a pretty fast trot and knocked her over.

"Q. What did the driver do before he struck her, if anything? A. No, sir. . . .

"Q. You didn't see the buggy until it came in contact with your mother? A. No, sir.

"Q. Where was your mother when you saw the buggy in contact with her? A. She was going across the sidewalk and the buggy knocked her down.

"Q. Where was she and where was the buggy when you first saw the buggy? A. It was a little distance from the sidewalk.

"Q. And where was she? A. She was a little ways from the sidewalk too."

The physician who attended on plaintiff after her injury gave this testimony:

"Q. What do you say was the cause of her death?

A. Well, I couldn't determine any lesion on her body. From my observation of her I must be of the opinion that she died as a result of shock which she received by being struck.

"Q. By being struck with this horse and buggy? A. Yes, sir.

"Q. What was her condition — she was weak? A. She was not able to be up.

"Q. Not able to be up? A. No, sir.

"Q. How did she evidence she wasn't able to be up? —What were the symptoms, Doctor? A. Well, as soon as she would sit up—I tried to have her sit up a few times and she felt faint. She couldn't sit up and fell— if she wasn't supported she fell right back on her pillow.

"Q. Was that her condition from that time, the 4th day of May, until the 16th, when you sent her to the hospital? A. Yes, sir. . . .

"Q. If a woman was knocked down by a shaft hitting her in the side on a horse going in a brisk trot, would there be any evidence of it? A. Of what?

"Q. Have any physical signs? A. Not necessarily?

"Q. You think that could be done without even bruising the skin? A. Yes, that could be done in my opinion.

"Q. Without leaving any blue places or any evidence of it whatever? A. Yes, sir.

"Q. That can be done? A. Yes, sir.

"Q. That is your opinion about it? A. That is my opinion. . . .

"Q. Then the hemorrhage of the brain that you speak about would be the result of physical violence? A. Yes, sir.

"Q. And not from the nervous shock? A. No, sir.

"Q. Did you find any evidence on the head of physical violence? A. Only that she complained of pain in the back of her head. . . .

"Q. And they are brought about, too by shock, such as being run into as this woman was — by being run into by a horse and buggy as this woman was— shocked? A. Well, I do not think that shock would produce a hemorrhage.

"Q. Well, being struck by a horse or shaft of a buggy—thrown down on the ground? A. That might produce hemorrhages, yes, in my opinion." Witnesses that deceased was apparently at least strong and healthy until she was knocked down by the buggy. That accident put her to bed and she died in a short time. All the foregoing evidence is ignored or its force reasoned away in holding no prima facie case was made. I deem the decision in this cause in conflict with the decisions of the Kansas City Court of Appeals in Stafford v. Adams, 113 Mo. App. 717, and Rattan v. Ry. Co., 96 S. W. 735, and therefore ask that this case be certified to the Supreme Court for final adjudication.