J. W. McCLANAHAN, Admr. of the Estate of FLOR-ENCE WHITWORTH, Deceased, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

St. Louis Court of Appeals.    Argued and Submitted February 8, 1910. Opinion filed March 8, 1910.

1.  **CARRIERS OF PASSENGERS: Injury to Passenger: Defect in Platform.**  A railroad company is required to keep a platform at a station on which it invites passengers to board and alight from its cars in good condition, and is responsible for an accident to a passenger boarding or alighting from its cars by reason of a defect in such a platform.

2.  **EVIDENCE: Personal Injury: Fractured Bone: Hypothetical Question.**  In an action for personal injuries, where a claim was made that one of plaintiff's femur bones was fractured and expert witnesses for defendant had testified it would be impossible for a person who had a fractured femur to walk, testimony by said experts, in answer to a hypothetical question propounded by counsel for plaintiff, that assuming there was only a partial fracture at the time of the accident, it might have been possible for plaintiff to have walked, was properly admitted, as plaintiff was entitled to have her theory of the case presented by expert testimony.

3.  **CARRIERS OF PASSENGERS: Injury to Passenger: Instruc-tions: Physical Facts.**  In an action against a railroad company for personal injuries alleged to have been received by plaintiff's falling into a hole at a station platform, one of the issues was, whether or not one of plaintiff's femur bones was fractured.  The uncontradicted evidence showed that after the accident she was about on her feet until the next morning and expert witnesses testified it would have been impossible for her to have done this, if her femur was fractured.  *Held,*.

McClanahan v. Railroad.

the refusal to give a cautionary instruction to the effect that if the jury believed the statements made by plaintiff that her injury was received by falling into a hole was contrary to the physical facts of the same evidence, her statements with reference to her injury should be disregarded, was reversible error.

4. ———: ———: Proximate Cause: Burden of Proof. In an action for injuries from a defect in a station platform received by one alighting from a train, the burden is on plaintiff to show that the injury is directly traceable to the accident.

5. WITNESSES: Failure to Produce: Presumption. In an action for personal injuries, the failure of plaintiff to produce as witnesses the physicians whom she employed to attend her and a young man who was a member of the household and who was in the house when plaintiff came home immediately after the accident, was a strong circumstance against her.

6. CARRIERS OF PASSENGES: Injury to Passenger: Cause of Injury: Evidence Held Lacking. In an action for injuries to one alighting from a train from falling into a hole in a station platform, *held*, there was a lack of evidence to show the injury was solely and directly traceable to the accident alleged.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley,* Judge.

REVERSED AND REMANDED.

*W. F. Evans* and *Moses Whybark* for appellant.

(1)   The court in overruling the defendant's motion for a new trial. The verdict under the pleadings was so manifestly against the evidence that it ought to have been set aside. Spiro v. St. Louis Transit Co., 102 Mo. App. 250; Friesz v. Fallon, 24 Mo. App. 439; Kennedy v. Transit Co., 103 Mo. App. 1; Spohn v. Railroad, 87 Mo. 74; Bank v. Railroad, 98 Mo. App. 330. The verdict was a bare conjecture, and not supported by the facts. Demaet v. Storage & Packing Co., 121 Mo. App. 92; Weltmer v. Bishop, 171 Mo. 116; Champagne v. Hamey, 189 Mo. 709; Phippin v. Railroad, 196 Mo. 321. (2)   The testimony of plaintiff was that three physicians, Phipps, Mayes and Crow,

attended her just after her injury, and yet not one of them was introduced nor their absence accounted for, nor any reason assigned for the failure, but she relied exclusively on the testimony of Drs. Hendrix, Byers and Faris, who made the examination of plaintiff under the order of the court, long after she claims she was injured. Smart v. Kansas City, 91 Mo. App. 586; Lynch v. Railroad, 208 Mo. 1; Reyburn v. Railroad, 187 Mo. 565, 16 Cyc. 1062; 22 Am. and Eng. Ency. Law (2 Ed.), 1261; 11 Am. and Eng. Ency. Law (2 Ed.), 503, par. 2; Pacific Coast S. S. Co. v. Bancroft-Whitney Co., 36 C. C. A. 152; Railroad v. Ellis, C. C. A. 454. These physicians were not accessible to the defendant; they were incompetent to testify on behalf of the defendant, but were competent for plaintiff. R. S. 1899, sec. 4659; Diel v. Railroad, 37 Mo. App. 454; Kerstner v. Vorweg, 130 Mo. 196; Bank v. Worthington, 145 Mo. 103; Standard Oil Co. v. State (Tenn.), 10 L. R. A. (N. S.) 1015. And in a case like this the rule requires the plaintiff to call the physician who examined her shortly after the accident to testify as to the extent of her injuries. Smart v. Kansas City, 91 Mo. App. 586; 22 Am. and Eng. Ency. Law (2 Ed.), p. 1261, par. c. (3). The testimony of the plaintiff as to extent of injuries she received, and her subsequent conduct on the same evening, is so irreconcilable with the theory that she broke her hip bone by falling into the platform hole as not to warrant the submission of the case to the jury; saying nothing of the testimony of the large number of witnesses who saw her that evening walking around her house, and elsewhere. Oglesby v. Railroad, 177 Mo. 272; Weltmer v. Bishop, 171 Mo. 116; Spiro v. Transit Co., 102 Mo. App. 250; Demaet v. Storage & Packing Co., 121 Mo. App. 104; Smart v. Kansas City, 91 Mo. App. 586; Zalotuchin v. Railroad, 127 Mo. App. 577; Hook v. Railroad, 162 Mo. 569; Champagne v. Hamey, 189 Mo. 726. (4) The appellate courts will not accept

as true the testimony of a witness, although the trial court has, when the testimony is opposed to reason and physical law. Reed v. Railroad, 112 Mo. App. 575; Stafford v. Adams, 113 Mo. App. 717; Friesz v. Fallon, 24 Mo. App. 439; 1 Elliott on Evidence, sec. 39, pp. 37-40; 4 Elliott on Railroads (1 Ed.), sec. 1703, pp. 2723-25. (5) The inevitable conclusion in this case as to the verdict must be, that it was the result of partiality, or prejudice on the part of the jury, and a judgment based on such a verdict should be reversed. Jeans v. Morrison, 99 Mo. App. 208; Gage v. Trawick, 94 Mo. App. 307; Cook v. Railroad, 94 Mo. App. 417; Cannon v. Moore, 17 Mo. App. 92; State v. Musick, 71 Mo. 401; State v. Zorn, 71 Mo. 415; State v. Jaeger, 66 Mo. 173; Rosecranz v. Railroad, 83 Mo. 678; Baker v. Stonebraker, 36 Mo. 338; Price & Sherrill v. Evans, 49 Mo. 396; Spohn v. Railroad, 87 Mo. 74. (6) The court erred in overruling defendant's objection to the methods of examination of Drs. Hendrix, Faris and Byers by the plaintiff, and admitting evidence not based on the allegations in the petition, but contradictory thereto, nor sanctioned as hypothetical questions, and because so speculative and problematical as not to be competent as evidence at all under any phase of any case. The testimony admitted by the court as expert testimony was beyond the knowledge, skill and experience of the physicians and of the profession, and could not aid the jury. Combs v. Construction Co., 205 Mo. 367; Thomas v. Railroad, 125 Mo. App. 131; Goken v. Dallugge, 72 Neb. 16 (9 Am. & Eng. A. Cas., 1222, l. c. 1224). (7) The evidence on behalf of plaintiff was all conjectural and her case should fail, and the court erred in submitting it to the jury. Browning v. Railroad, 106 Mo. App. 729; Root v. Railroad, 195 Mo. 348; Warner v. Railroad, 178 Mo. 125; Peck v. Railroad, 31 Mo. App. 123; Smart v. Kansas City, 91 Mo. App. 586; Stokes v. Burns, 132 Mo. 214; Glick v. Railroad, 57 Mo. App. 97; Torpey v. Railroad, 64 Mo. App. 382;

Caudle v. Kirkbride, 117 Mo. App. 412; Phelan v. Paving Co., 115 Mo. App. 423.

*Von Mayes* and *Duncan & Bragg* for respondent.

(1) The court properly overruled defendant's motion for a new trial. The evidence not only supported the verdict, but no inference could have been drawn therefrom by the jury except that the fracture was the result of the fall in the hole. Under the facts stated by the witnesses this inference is not adverse to physical law. Spiro v. St. Louis Transit Co., 102 Mo. App. 250; Chemical Co. v. Railroad, 85 Mo. App. 667; Baldwin v. City of Springfield, 141 Mo. 205; Charles v. Patch, 87 Mo. 450. (2) Under this point of appellant's brief it complains of plaintiff not calling the physicians who attended her shortly after the accident. The necessity of using these witnesses was obviated by the action of the court, on motion of defendant, appointing a commission of physicians to examine plaintiff, who examined her on two different occasions and testified at the trial. Reyburn v. Railroad, 187 Mo. 565; Haworth v. Railroad, 94 Mo. App. 215; Marham v. Herrick, 82 Mo. App. 330. (3) The court properly overruled defendant's objections to the questions propounded by plaintiff to the expert witnesses. The purpose of these questions was to show by these physicians, versed in the fractures of bones that the partial fracture of a bone was possible, and that it was possible for a person to walk on a partially fractured bone, and that it was possible to convert a partial fracture into a complete fracture by exercising the bone partially fractured. These matters are not of such common knowledge that everyone is presumed to understand them, and were not beyond the skill or knowledge of the witnesses. Boettger v. Iron Co., 124 Mo. 104. (4) The questions propounded to the physicians called for the opinion of the witnesses. Defend-

ant's objections were not made on the grounds that these questions called for a conclusion of the witnesses or sought to elicit facts beyond their knowledge and skill. Thomas v. Railroad, 125 Mo. App. 134; O'Neil v. Kansas City, 178 Mo. 91; Schlereth v. Railroad, 115 Mo. 87; McCormick v. Hickey, 24 Mo. App. 362. (5) The petition alleges a fracture of the femur bone as a result of falling in the hole. It was therefore not required that plaintiff should prove that the fracture was complete immediately after the fall, If there is a variance between the allegation and proof in this respect it is not material. The question of variance between the allegations and proof was not raised in the lower court. R. S. 1899, secs. 655 and 656; Howard County .v. Baker, 119 Mo. 406; Mellor v. Railroad, 105 Mo. 455.

STATEMENT.—This is an action for damages for injuries sustained by plaintiff's intestate in alighting from a train of the defendant at a place called Terry, in Pemiscot county. It was commenced on the 18th of January, 1908, by Mrs. Whitworth, plaintiff's intestate, who has died since the case has been appealed to this court. For convenience and brevity, we will refer to her as plaintiff in the case, or even as respondent. In her original petition the plaintiff stated, after the formal averments of the incorporation of the defendant and that it maintained a platform at this station of Terry for the accommodation of its passengers, that on the 28th of December, 1907, the conductor in charge of the train took hold of plaintiff's hand to assist her in alighting from the step of defendant's passenger coach to the floor of the platform, and that in assisting plaintiff to alight from the train, the conductor suddenly pulled or jerked her and caused her to turn around and step backwards upon the platform, and that in stepping backwards plaintiff's right foot and leg went through a hole in the platform which defend-

ant had carelessly and negligently permitted and suffered to remain, thereby causing plaintiff to fall and be violently thrown upon her right side upon the platform; "that by reason of plaintiff's foot and right leg going through said hole in the platform, . . . and the fall of plaintiff in the manner aforesaid, and occasioned thereby, she sustained and received the following injuries without fault of her own, to-wit:    A bad bruise and slight abrasion of the outer upper third of the right thigh; a slight abrasion and bruise of the inner third of the upper right thigh; a dislocation of the right hip; a rupture of the synovial membrance of the joint of the right hip; a bruise and strain of the peritoneum; a severe injure to the kidneys and lower bowels; and a sever wrench and strain of the spine and other internal and external injuries, all of which injuries are permanent in nature and character." Damages in the sum of fifteen thousand dollars are demanded.    Afterwards, on September 4, 1908, plaintiff filed an amended petition, in which the injuries sustained and received are set forth as follows: "Bruise and abrasion of the outer upper third of the right thigh; bruise and abrasion of the inner third of the upper right thigh; rupture of the synovial membrane of the joint of the right hip; dislocation of the right hip; fracture and breaking of the femur bone in the right leg; bruise and strain of the peritoneum; wrench and strain of the lower spine, and other internal and external injuries, all of which are permanent in nature and character."

The answer of defendant was a general denial and plea of contributory negligence, to which plaintiff filed a reply.

The cause coming on for trial before a court and jury, evidence was introduced on the part of plaintiff tending to show that there was a hole in the railroad platform through which plaintiff had fallen; it was about ten inches wide and seven or eight feet long,

reaching about two-thirds across the platform. Plaintiff testified that on the day of the accident, when the train whistled for the stop at Terry, she got up, walked out between the coaches, and one of the train men helped her off. He stepped off ahead of her, set the footstool down, stepped back, reached up with his right hand, took hold of plaintiff and gave her a jerk and "turned her loose." She staggered backwards into the hole in the platform and her right leg went through the hole as far as it could; it was hurting her and she turned sick. She got up without assistance and went from there over to her house. That was about 11 or 12 o'clock in the forenoon; didn't remain at home during the afternoon but went over to her aunt's, a Mrs. Douglas, in the evening. Plaintiff further testified that the night after the injury, after she went to bed, she never rested to any amount all night, her hip hurt her. Her husband and a young man living with them, named Age, had to turn her over in bed and help her out of bed. The next morning she tried to get up and couldn't stand on her feet by herself; had to rest her weight on her left leg. Her husband helped her to dress and Age helped her in the kitchen. She made biscuits for breakfast and they helped her to the table and she ate breakfast. Afterward she washed the dishes, stood leaning against the stove with the weight on her other leg; started back to the bedroom but fell before she got there; sent for a doctor that night but did not get one because the roads were bad; did not get a doctor until Tuesday or Wednesday. The accident had happened the Saturday previous. Dr. Mayes, Dr. Crow and Dr. Phipps treated her at the time of her injury and confinement to bed. She suffered badly during that period and was confined to her bed. It was a couple of months before she could walk by herself, to amount to anything. The limb is short now and hurts and always has hurt her; never had had any trouble with that hip or leg before. Her health prior to the

accident was good; had had some sickness but not bad; had never had any trouble with her hip or leg before and no other fall or accident between the time she stepped into this hole and the time she was not able to move or walk on the limb, and had met with no accident since. The leg was bruised and skinned and since the injury and at the time of the trial she has suffered from a wrench or sprain of the lower spine.

On cross-examination plaintiff said that she and her husband scuffled very often; about three weeks before he and plaintiff and Arthur Age scuffled and they all fell down; had not scuffled any after she fell in the hole at the railroad platform, and had not hurt herself at all in any way after she fell in the hole; had never told anybody that falling in the hole did not hurt her hip; had received no injury whatever afterwards. This was Saturday that she went home on the noon train, and thought that they sent for a doctor Sunday evening but didn't get one; didn't get one until Wednesday, when Dr. Mayes came and examined her hip and left some medicine to quiet her. He did not set her hip that day; didn't know how long it was until another doctor came; was sick and didn't keep up with the days of the week; doesn't know what was done after that; was in bed twenty-one days before she ever sat up. Doesn't remember how often the doctor came but he was there several times; Dr. Mayes, Dr. Crow and Dr. Phipps were there together once, and Dr. Phipps had made a trip to see her since she had been up. Dr. Crow was there twice when Dr. Mayes and Dr. Phipps were with him all three of them being there together, and he made some trips alone to see her. He had treated her for the injury. Guesses anyone could see the injury by examining her without her telling them what it was; was bruised and skinned where the injury was; didn't go anywhere else that evening but from the train home and up to her aunt's, Mrs. Douglas', and back; did not walk around the house much.

On redirect examination plaintiff testified that before the accident she kept a boarding house and had twelve or twenty boarders and did her work herself; since the accident hasn't been able to do anything much; between the time she fell through the hole and the next morning she suffered some from this injury; doesn't know whether she limped during the afternoon; was sick and hurting and never noticed; had never suffered from the right hip before the accident; had had heart trouble before the accident; after the accident had suffered bad and since then has had these spells all the time, off and on, about as frequently as before.

On re-cross and redirect examination she gave no testimony materially bearing on the accident, principally about her several marriages and the birth of her child, which it appears died when it was four weeks old.

Plaintiff called Dr. Byers and Dr. Faris as witnesses on her behalf, who testified that under order of the court they had examined plaintiff, found a shortening of the right leg, in the neighborhood of two and a half inches, and attributed it to a fracture of the femur; had made a second examination, also under order of the court, and did not find plaintiff suffering from any other injury at this second examination. The right leg was some two and a half inches shorter than the left; attributed this shortening to a fracture of the thigh, of the femur, the upper third of the femur was broken. These surgeons were recalled by defendant and gave testimony practically to the same effect as that given by Dr. Hendricks.

Dr. Hendricks, called as a witness by plaintiff, was one of the three physicians who had made an examination of the plaintiff under order of the court. He testified that he had found a shortening of the right femur, about two and a half inches or more, due to a fracture of the upper third of the femur. The first

examination that the physicians made was made two or three months before the trial and the last was made a day or so before the trial. From the examination. Dr. Hendricks testified that he should judge the fracture to have been in the upper third, "overriding over fragments." With the exception of this trouble she seemed to be all right; considered the injury to her limb permanent. On cross-examination Dr. Hendricks said: "The femur articulates in the hip joint and at the knee, and it was the upper third of this bone we found fractured." The fracture is in the upper third but not in the neck of the bone. "The injury was just below the great trochanter," as well as they could tell, an inch if not more below. It was a complete fracture, "an overriding of the fragments," that caused the shortening. By complete fracture the doctor said he meant that the bone was broken in two, fractured. Had had a conversation with plaintiff about having walked on the injury and she told him she had walked home, possibly to a neighbor's house; said she went to bed about 9 o'clock that night and several days afterwards she had a doctor. Dr. Hendricks then testified on cross-examination (giving his exact language) : "From my examination of the injury, and the condition I found her in, in my opinion, I don't think it possible for her to have walked; don't see how it could be. If she had run her leg through a hole in the platform and received that injury, in my opinion, she would not have been able to walk home, nor to remain up; don't see how she could with a complete fracture of the femur. She gave no reason why she hadn't sent for a doctor before she did. There is one fracture of the femur that she might possibly walk with and that is an impacted fracture of the neck of the femur, but this was not such a fracture; this is a complete fracture of the bone now, so far as I know. Found her condition practically the same, the shortening about the same extent, at both examinations. Noticed no other injury." He

further testified that a fracture of the kind sustained
by plaintiff is very painful at the time received and
on moving it it grows worse.

On redirect examination Dr. Hendricks testified
that he doesn't know whether the fracture was com-
plete at the time plaintiff fell through the hole as he
didn't see her. He said: "As to whether it was par-
tial at first, and afterwards became complete, all I have
to go by is what I found at the present time, and as it
stands now I don't think she could have walked." He
was asked by counsel for plaintiff, if the fracture at
the time immediately after the accident was only a par-
tial fracture and with use of the limb for half a day or
more then became a complete fracture, whether the
same condition would exist as it does now. This was
objected to by defendant, objection overruled, defend-
ant excepting, and the witness answered that an incom-
plete fracture could easily be made a complete frac-
ture. Asked if the fracture at the beginning was merely
an incomplete fracture, whether there would be any-
thing hindering the party suffering such injury from
walking a short distance or for half a day until it be-
came a complete fracture, the witness answered that if
it was incomplete it was a rare possibility that she
might hobble around a little while but it is very pain-
ful if the periosteum, the covering of the bone, is ever
broken. Counsel for plaintiff repeated the question,
"But if it is an incomplete fracture, she can walk
some until it becomes a complete fracture?" Dr. Hen-
dricks answered: "If you have a fracture of the fe-
mur, I don't see how you could walk." Counsel asked
him if he thought it was impossible to do that. This
was objected to, objection overruled, defendant ex-
cepting, and witness answered: "There is a rare pos-
sibility that she might walk with an incomplete frac-
ture, but very rare." On re-cross examination Dr.
Hendricks testified that he did not think many people
walked with a fractured femur, especially of the upper

third.   In some cases they might do it, if the fracture would not have a break in the covering of the bone, the periosteum.   You could call a fracture incomplete, if there is simply a crack on one portion of the bone, yet it might be incomplete and all broken off, "it would simply shiver;" in that instance she could not walk because the least weight would force it on.   If there is a very slight fracture, she might possibly walk but if there was a fracture of any portion of the bone beyond what I would call slight, a person of any weight would naturally break it on.   Mrs. Whitworth is a little bit fleshier now than when he last treated her; would judge her to weigh 165 pounds.   She has always been a fleshy woman.   On the second redirect examination, this witness was asked if it wasn't a fact that a woman with the strength of muscle of plaintiff, if that fracture had not been a complete fracture, whether the strength of those muscles would be more than likely to hold the limb in place, if she gives it the advantage in walking, putting the most of her weight on the other foot, couldn't she walk under these circumstances, and the witness answered that by not bearing her weight on her foot, by hobbling, she certainly could, but as he said before, he repeated, that incomplete fracture doesn't convey anything.   "You don't know to what extent it is; you can't say; you can't form an opinion."  He was asked by counsel if the fact that now it is a complete fracture is any reason why it could not have been an incomplete fracture at that time and afterwards became a complete one.   This was objected to, objection overruled, defendant excepted, and witness answered, "No, sir, that is all right; you can convert an incomplete fracture into a complete fracture."   Under re-cross examination, the Doctor stated that the diameter of this bone at that point in plaintiff would be fully an inch and a quarter.   "With an incomplete fracture, it depends on the constitution of the person as to how much of the bone would have to be affected, wheth-

er the person could walk; depends on the condition of the bone. In my opinion, if she had received the injury I found, she couldn't have walked. All I can speak from is that we have at the present time, and I couldn't say to what extent of partial fracture one could walk; can't give an opinion. My opinion is with the fracture of the femur she will not walk." "There is a rare possibility," said the witness on redirect examination, "of a person walking with an incomplete fracture, but as to the extent of the incomplete fracture I wouldn't attempt to say. One can walk with a slight fracture. . . . Neither a man nor a woman would walk with a fracture of the upper third of the femur. There is a difference in a fracture and an incomplete fracture; with a complete fracture one couldn't walk. With an incomplete fracture one might walk, but I can give no opinion as to how much would be broken, the extent, and yet the person be able to walk." On final re-cross examination Dr. Hendricks said: "I found a complete fracture in Mrs. Whitworth. Can't tell whether it was at one time an incomplete fracture. Can't determine as to the exact nature of the fracture, but it was possibly an oblique fracture, across the bone slightly. Don't think it was straight across."

Witnesses for plaintiff testified that prior to the accident plaintiff had not been lame; had done her own housework.

This was substantially all the testimony offered by plaintiff and at its close the defendant asked an instruction in the nature of a demurrer to the evidence which the court overruled, defendant excepting.

Upon its part defendant introduced testimony of Mrs. Alice Douglas, plaintiff's aunt, to the effect that about a week after plaintiff stepped into the hole, she sent for the doctors to put bandages on her and said in the presence of her aunt and of Mrs. Lilly Parrot and of Frank Parrot, that Will Whitworth (plaintiff's husband) "thought that he would ride or was going to

ride on flowery beds of ease, and rock in a fine rocking chair at her expense on account of her being hurt on the railroad," and Mrs. Whitworth (plaintiff) said: "You all think I got hurt on the railroad;" but she said she didn't get hurt on the railroad; didn't say how she got hurt, and witness did not ask her. Mrs. Parrot testified to the effect that she saw plaintiff during the afternoon that she said she stepped into the hole; she was up walking around but appeared to limp some on her right leg.

The Sunday morning after the accident, a witness was at Mrs. Whitworth's, was helping her up, when Mrs. Whitworth showed her a bruised place on the inside of her right hip and on the inside of her thigh opposite the bruise on her right hip. She said that those bruises were caused by her falling into the hole in the platform. Mrs. Whitworth had some use of her right leg all the time after she got sick Sunday morning and during her sickness, but couldn't use it any better until after the doctor treated it.

Three or four days before this accident, a witness had seen plaintiff and her husband scuffling and wrestling in their yard and on their front porch, and Whitworth threw his wife down on the front porch very hard. She told witness that the fall had made her stiff and she walked lame in her right leg at that time, which was three or four days or a week before the, time she stepped into the hole in the platform.

Other witnesses offered by defendant testified to the effect that they saw her on the afternoon after the accident climb up on a stump about three feet high and get onto a plank walk that led from the top of the stump near her house to the railroad and saw her walk the plank walk to the railroad; she did not limp when she was walking this plank walk and showed no sign of being crippled when she climbed upon the stump and got on the walk; saw her that afternoon get up from the table and walk about the room. On the

day of the accident, December 28th, witnesses saw her outside her house. She did not walk lame, couldn't detect any difference in her walk then and before she was injured; saw no evidence of limping. The plank walk referred to was about three and a half feet from the ground. It rested upon some posts with cleats nailed across and was used for a walk. The planks were about twelve inches wide. The walk was one plank wide in one place and two planks in another; it was over a barrow pit. To get on the walk she would have to climb up a little ash stump and she was on the plank walk when witnesses saw her. She had to walk this plank about thirty or forty feet over a water hole.

A witness (Beasley) testified that he went to plaintiff's house the day of the accident and talked with her. Plaintiff told him about how she had enjoyed her trip and about falling through the hole in the platform; that she had stepped backward and fallen into the hole. Witness asked her if it did not hurt her and she said: "It didn't hurt me seemingly at all, it didn't hurt me a bit that I know of." She told witness that falling through the hole did not hurt her and she was laughing when she spoke about it, and telling about riding on the train, and that it made her "dizzy-headed," and that that was how she came to fall through the hole when she got off the train; talked with her an hour that time and she was walking around in the house and it did not appear to witness that she limped; was intimately acquainted with her; boarded at her house; saw her the next day (Sunday morning), stayed at her house Saturday until dark, while she went over to see her uncle.

The brakeman, who assisted plaintiff off the car, and the conductor of the train testified to all they knew about the accident. It is not material to produce their testimony.

Plaintiff herself was recalled in rebuttal and denied that she had ever told Mrs. Douglas that her husband said that he was "going to ride on flowery beds of ease and rock in a fine rocking chair," on account of plaintiff having been hurt by the railroad company, nor that everybody thought she got hurt on the railroad but that she did not, and denied making any such statement; recalls the fact of Mrs. Parrot having been at her house, but not of her husband having been there; denied the statements about her condition at the time she had her baby which were testified to by Mrs. Parrot; did not tell Mrs. Parrot that she had to be helped up out of her chair; admitted that she and her husband had scuffled but said that she had never been hurt in any of these scuffles; that the last time she scuffled was about two weeks before she fell in the hole; did not tell Mr. Childs or Mr. Beasley that she was not hurt by stepping into the hole; had never received any accident or hurt to her right hip or otherwise at any time after stepping into this hole; had cooked for fifteen or twenty men and would be tired from standing on her feet and complained of her back and side and might have called it her hip. Thinks she said something to Mrs. Parrot the morning after she and her husband had scuffled the last time but did not remember what it was; did not tell any one that she always got "dizzy-headed" when she rode on the train; had been on the train a good many times and not accustomed to being made sick by it.

At the conclusion of the testimony the defendant asked for an instruction for direction of a verdict in its favor which was refused and defendant excepted. At the request of plaintiff the court instructed the jury that if they found from the evidence in the case that on the 28th of December, 1907, the defendant maintained the platform and there was an unsafe and dangerous hole in it which was known or might have been known to defendant, and if they found plaintiff was a

passenger on defendant's train on that date and that after alighting from the train and while exercising ordinary care on her part, she stepped or fell into the hole, "and as a direct result thereof the femur bone of her right leg was fractured and broken," then their verdict should be for plaintiff. The second instruction was as to ordinary care which is not criticised. The third instruction is as to the measure of damages, given at the instance of plaintiff, and is to the effect that if they found for plaintiff, in estimating her damages, they should take into consideration not only the physical injury and bodily pain and mental anguish by her endured and suffered, but also pain of body and mind, that is, the suffering, inconvenience, discomfort and annoyance, if any, as appears from the evidence would reasonably and directly result to her from the injuries in the future and their verdict should be for such sum as in the judgment of the jury under the evidence would fairly and reasonably compensate her for her damages, if any, directly resulting or that the jury may be reasonably certain will directly result to her from her injuries, not exceeding the sum of $15,000. Defendant excepted to the giving of these instructions and at its request the court gave nine instructions, which need not be set out. An instruction, No. 1, to find for defendant was refused.

The eleventh instruction which the defendant asked is as follows:

"11. The court instructs you that even though the plaintiff has testified that her injury was received by falling into the hole, yet, if you believe such statements are contrary to the physical facts of the same evidence, you must disregard her statements for that reason with reference to her injury."

This was refused and defendant duly saved exception to its refusal, as also to the refusal to give instruction No. 1. The jury returned a verdict for $4000 in favor of plaintiff. Motions for new trial and in ar-

rest were duly filed, overruled, exceptions saved and an appeal duly perfected to this court by the defendant.

REYNOLDS, P. J. (after stating the facts).—Errors assigned are that the court erred in admitting incompetent evidence on behalf of plaintiff; in excluding competent evidence offered by defendant; in giving the instructions for plaintiff and in refusing instruction No. 11 and the demurrer to the evidence asked by defendant, and that the verdict is excessive, the result of bias and prejudice.

There was no error in the instructions given for plaintiff.

The platform on which plaintiff fell was used by the defendant at Terry; defendant invited passengers to board or alight from its cars by means of this platform; it was required to keep it in good condition. Defendant knew or should have known of its condition, and is responsible for whatever accident happened to persons boarding or alighting from its train by reason of the defect in the platform. Nor was it error to overrule the demurrer to the evidence of plaintiff. The case was for the jury under proper instructions. We would have no hesitation in holding the appellant company responsible for any injuries received by plaintiff, and do not think that the verdict was excessive, provided we could be satisfied that the jury were warranted by the evidence in the case, in finding that the fracture of the bone and consequent shortening of the right limb by some two and a half inches, occurred by reason of plaintiff falling into the hole in the platform. The accident occurred on the 28th day of December, 1907. Twenty-one days thereafter plaintiff filed her petition in the circuit court of Pemiscot county. We have set out the material allegations in our statement. It will be noticed that the original petition avers that the injuries resulting from the accident were "a bad bruise and slight abrasion of the outer upper

third of the right thigh; a slight abrasion and bruise
of the inner third of the upper right thigh; a disloca-
tion of the right hip; a rupture of the synovial mem-
brance (probably meaning membrane), of the joint of
the right hip; a bruise and strain of the peritoneum;
a severe wrench and strain of the spine and other in-
ternal and external injuries.'' It is in evidence in this
case that a few days after the injury, plaintiff was at-
tended by three physicians, whom she and her hus-
band summoned. The use of the technical terms in the
original petition lead to the fair inference that she
described the injuries suffered by her in the accident
as they were told to her or to her attorney by these
physicians or surgeons who had attended her, when
having in preparation the drafting of the petition in
which her cause of action is set out. It is true that
some of the terms used in this petition in describing
the injuries received are so general that we cannot,
with certainty, say under the allegation of ''other in-
ternal and external injuries,'' a broken bone is in-
cluded, but surely a fracture of any bone, much less of
the femur or large upper bone of the right leg, would
hardly be said to be covered by any of the specific in-
juries set out in this original petition, and it is almost
incredible that any surgeon or physician authorized to
practice in this State should confuse a fracture of the
femur, so serious as to result in the shortening of the
limb, with a dislocation of the right hip or a rupture
of the synovial ''membrance'' (membrane) of the joint
of the right hip, and certainly remarkable that so se-
rious and patent an injury as the fracture of the fe-
mur should not have been specifically mentioned, if
that injury was then present. On September 4, 1908,
that is to say, about nine months following the filing
of the first petition in the case, plaintiff filed her
amended petition, in which it will be noted that the in-
juries charged to have been received on the occasion
of the accident are, ''bruise and abrasion of the outer-

upper third of the right thigh; bruise and abrasion of the inner third of the upper right thigh; rupture of the synovial membrane of the joint of the right hip; dislocation of the right hip;'' (and for the first time) ''fracture and breaking of the femur bone in the right leg.'' Then are repeated, ''bruises and strain of the peritoneum; wrench and strain of the lower spine, and other internal and external injuries.'' Thus for the first time, and over nine months after the accident occurred, plaintiff avers that the result of the accident was the ''fracture and breaking of the femur bone of the right leg.'' It may be said here that at the trial, and justified therein by the testimony of all the physicians and surgeons who testified, plaintiff abandoned all attempt at showing any injuries received by reason of the fall save this fracture and breaking of the femur bone of the right leg. The trial court and jury were therefore confronted with the sole proposition as to whether the fracture of this femur bone was the result of the accident met with by plaintiff when she fell or stepped into the hole in the platform at Terry. That is the question we must face in determining whether the verdict and judgment are supported by the evidence, and whether the case was properly tried. The testimony of plaintiff herself, to repeat it very briefly, is that prior to falling into the hole she had met with no other accident, and had had no trouble with her limb, and was not lame, and that subsequent to this accident at the railroad platform she had not been hurt nor had she met with any accident that could have produced the injury. Plaintiff stands practically alone in her testimony, save as to the fact that she fell into the hole, that she subsequently was confined to her bed, that when she got up she was lame, and that her leg is shortened. On many matters, such as her previous health, her declarations and statements as to the immediate effect of the accident, and the like, she is contradicted by several witnesses. The fact that her leg

is broken and limb shortened, and that this fact was known at least since the examination made some few months before the trial by the three surgeons appointed by the court, is not disputed. Nor does plaintiff deny that at least until the morning following the accident, she went about her occupations and kept on her feet, with little noticeable change from her former walk. While plaintiff stands alone in testifying that she met with no other accident, the defendant has produced no witness to the contrary—no testimony showing any prior or subsequent accident. Plaintiff herself and every one of her witnesses examined on this point, as also a crowd of witnesses introduced on the part of defendant, testified that after the occurrence of the ac- cident on the platform, the plaintiff got up out of the hole without assistance, walked from the station to her house, which was on the other side of the railroad track and some one hundred feet back from the track, there met her husband and young Age, ate her dinner with them, this being between 12 and 1 o'clock of the 28th of December, and about two hours thereafter went from her house to that of her aunt. She remained at the house of her aunt several hours, until, as she says, be- tween sundown and dark, and returned home and as- sisted in getting supper for the family. In going to or returning from the residence of her aunt, plaintiff was seen by several witnesses, her neighbors, as she crossed barrow pits or a barrow pit, alongside of the railroad track, which was spanned by a plank walk about 30 feet long. At places along this walk there was a twelve inch plank; at other places two twelve inch planks, with wooden trestles under them. One end of the walk rested on a stump two and a half feet above the ground, the other end rested on the railroad embank- ment. To get up on to this plank walk plaintiff was obliged to climb up this stump and then reaching the plank walk go along it to the other end. The plank walk at the time, according to the testimony, was slip-.

pery and muddy. Not one of the witnesses testifies to observing that plaintiff limped or walked at any different gait from that which was her habit. All testified that she walked her usual gait. At the time of the accident, plaintiff was about 28 years old and weighed about 165 pounds. We have set out the testimony so fully in the statement that we will not go over it further.

During the period plaintiff was confined to her house or bed, about three weeks, she was attended by three physicians, whom she named. None of them were present or produced or examined at the trial. A couple of months before the trial, which was had in September, 1908, and at the instance of the defendant, the court appointed three surgeons to examine plaintiff, who conjointly examined her then, and subsequently, and a day or so prior to the trial, again examined her. These three surgeons testified unqualifiedly that if the femur bone or upper bone of the right leg was broken it would have been physically impossible for the plaintiff to have walked as she told them she had walked and moved about, and, basing their answers on facts embraced in hypothetical questions which covered the facts of her movements on the day of the accident, as testified to by all the witnesses, and on what she had herself told them, impossible for her to have walked, if she had broken the femur at the time stated. On hypothetical questions propounded to these three surgeons by counsel for plaintiff, they stated that there might have been a partial fracture at the time of the accident, and if that was a fact it might have been possible for this plaintiff to have done what she and all the witnesses testified that she had done immediately after the accident. But each of the surgeons who answered these hypothetical questions put by plaintiff's counsel, testified that no such case of partial fracture as supposed had ever come under his observation, and that he had never heard of one, that is,

a partial fracture that without any intervening cause resulted in such a complete fracture as here present. These hypothetical questions of plaintiff's counsel were objected to, but allowed. We see no error in this action of the court. Plaintiff was entitled to have her theory of the case so presented to these experts.

To meet the testimony of the surgeons, defendant asked an instruction which is numbered 11, and which we have given in full, it being to the effect that if the jury believe the statements of plaintiff about what she did after she received the injury to her leg, yet if they found that such statements were contrary to physical facts as those facts are in evidence, the jury should disregard her statements.

In the case of Hook v. Missouri Pac. Ry. Co., 162 Mo. 569, l. c. 580, 63 S. W. 360, it is said that a court will treat as unsaid by a witness that which in the very nature of things could not be said.

In the case of Phippin v. Missouri Pac. Ry. Co., 196 Mo. 321, l. c. 343, 93 S. W. 410, referring to many cases in which it had been held that where the established physical facts and common observation and experience conflict with the testimony of a witness, his testimony must yield and cannot be accepted as the basis of a verdict or judgment, the court says that these cases announce the law of this State so fully as to leave the question no longer open to debate or any doubt.

To the same effect are the decisions in Champagne v. Hamey, 189 Mo. 709, 88 S. W. 92; Oglesby v. Missouri Pac. R. Co., 177 Mo. 272, 76 S. W. 623; Weltmer v. Bishop, 171 Mo. 110, l. c. 116, 71 S. W. 167; Zalotuchin v. Metropolitan St. R. Co., 127 Mo. App. 577, l. c. 584, 106 S. W. 548; Demaet v. Fidelity Storage & Packing Co., 121 Mo. App. 92, l. c. 104, 96 S. W. 1045; Stafford v. Adams, 113 Mo. App. 717, l. c. 721, 88 S. W. 1130; Reed v. Chicago & S. R. Co., 112 Mo. App. 575, l. c. 581, 87 S. W. 65; Spiro v. St. Louis

Transit Co., 102 Mo. App. 250, l. c. 263, 76 S. W. 684. In the light of all the testimony in the case, we think that an instruction covering this should have been given. Furthermore, the burden is on plaintiff to show that the injury received is directly traceable to the alleged accident. Applying this latter rule, and the rule laid down in the decisions above cited, to the facts in this case, we are of the opinion that the jury should have had the cautionary rule announced in this eleventh instruction before them. The testimony of the surgeons certainly made it very doubtful as to the possibility of the accident complained of having produced the injury under which plaintiff is unquestionably laboring and plaintiff then to have shown no immediate effects or to have been able to do as she did. In view of the testimony of plaintiff herself and the undisputed testimony of unimpeached and uncontradicted witnesses, it was a question of whether her actions were compatible with known physical laws, and the jury should have had an instruction on that line; defendant's counsel were entitled to the aid an instruction along those lines would have given in their argument of the facts of the case. Many of the cases cited go much further than we are disposed to go in this case. There are cases wherein the appellate court went over the verdict of the jury and the finding of the judge. There was no refusal of instruction, as here, but the appellate court refused to accept a verdict which in its opinion was against known physical facts. We are reluctant to do that in any case. The verdict of a jury, properly instructed, is of great weight on that question. On the refusal to give an instruction along the line of this eleventh instruction, and having the facts of the case in mind, and in the light of the above authorities, we cannot allow the verdict to stand.

We are confirmed in our view that this verdict should not stand by the failure of the plaintiff to produce witnesses and offer testimony which must have

been under her control and which was of the highest importance. The fact stares us in the face, that immediately after the happening of the accident, plaintiff was under the care of three physicians, selected by herself; that after having had the benefit of their assistance and advice, she not only made no mention whatever of the fractured bone when she drew up her petition, but has not seen fit to call those physicians as witnesses in her behalf. She could call them, the defendant could not. We think it was her duty to have produced their testimony or accounted for its absence. The vital question in this case was whether plaintiff had suffered a partial or complete fracture, or for that matter, any injury of the femur as the result of her fall. It is to be presumed that these physicians examined her sufficiently to determine whether she was then suffering from any injury to this femur. Certainly the young man Age should have been produced at the trial by plaintiff or his absence accounted for. Neither was done. He was an inmate of the house, a member of the family; was in the house when plaintiff came from the station immediately after the accident; he was presumably cognizant of all that transpired immediately upon the return home of plaintiff and for some time afterwards.

In Reyburn v. Missouri Pac. R. Co., 187 Mo. 565, l. c. 575, 86 S. W. 174, the failure of the railroad to produce as witnesses persons in its employ who were presumed to have knowledge of the accident was held to be a strong circumstance against the defendant. That rule, in this case, applies especially to the absence of the testimony of this young man Age. As against the failure to produce the physicians, our Supreme Court in Evans v. Trenton, 112 Mo. 390, l. c. 404, 20 S. W. 614, distinctly held that the failure of plaintiff to call the attendant physicians as witnesses in her behalf. "was a strong circumstance that they would not corroborate her testimony in regard to the extent of her

injuries, and defendant was justified in urging this upon the attention of the jury." Our examination of authority leads us to think that its great weight is to the effect that the failure of the plaintiff to produce these surgeons, who, more than any one else, even the plaintiff herself, would have been qualified to testify as to the extent and nature of the injuries immediately following the accident, as well as the young man Age, is a circumstance that warrants us in entertaining serious doubt as to the good faith of the plaintiff.

In 1 Starkie on Evidence, *p. 54, the general rule is stated to be that "the conduct of a party in omitting to produce that evidence, in elucidation of the subject-matter in dispute, which is within his power, and which rests peculiarly within his own knowledge, frequently affords occasion for presumptions against him; since it raises a strong suspicion that such evidence if adduced would operate to his prejudice." So the rule is stated in 11 Am. and Eng. Ency. of Law (2 Ed.), p. 503, par. (2), and in the latter work it is stated, vol. 22, p. 1261 (c), that this rule has been applied where plaintiff, in an action for personal injuries, failed to call the physician who examined her shortly after the accident to testify as to the extent of her injuries. The authorities cited in support of this last are Cooley v. Faltz, 85 Mich. 47, and Vergin v. City of Saginaw, 125 Mich. 449. The Michigan statute covering the matter of testimony by a physician is practically identical with that of our own State. In the Cooley case it is said that the failure of the plaintiff to produce the physician who had attended her and who had examined and prescribed for her was a legitimate fact for the jury in determining the merits of the case. The same rule was applied in Ohio in the case of Katisfiasz v. Railway Co., 24 Ohio C. C. Rep. 127. It is announced as the law of the State in New York, in the case of Gordon v. The People, 33 N. Y. 501, and People v. Hovey, 92 N. Y. 554, as well as in Wennerstrom v. Kelly, 27 N. Y. Supp. 326.

These two latter cases were where there was a failure to call the wife who, in that state as in ours, is incompetent, generally, as a witness. It is true that the Supreme Court of the United States, in the case of Graves v. United States, 150 U. S. 118, held to the contrary. But in a dissenting opinion in that case by Mr. Justice Brewer he cites the above and other cases from Michigan, as also cases from Massachusetts, Maine, North Carolina and Georgia, as well as Starkie on Evidence, herein above quoted, all holding contrary to the views of the majority of the court. See also notes on page 582 (II. A.), 34 L. R. A. (old series) to case of Hay v. Peterson, 6 Wyo. 419, where many cases are cited in support of the rule, among others, that "to smother evidence is not much better than to fabricate it." The physician, in our State, cannot be examined by the adverse party as to information acquired by him in the course of his professional employment, but his exclusion is a matter resting with the patient—a right she can waive. In the case at bar no instruction was asked by the defendant covering the absence or failure to produce these witnesses, but the point has been distinctly raised by counsel for the defendant in their assignment of error and in their brief and we mention it, not in decision of the case, but as support for the view which we take of it, that in connection with the physical facts which are testified to beyond contradiction, the absence of this testimony of these physicians, as well as of the young man Age, under the peculiar facts in this case, does make against the plaintiff. Our conclusion on the whole case is that plaintiff has fallen so far short of clearing up the case by evidence presumably within her power to produce, that while we do not feel warranted in saying there is no substantial evidence to sustain the verdict, we do think there is a lack of evidence to show that the injury is solely and directly traceable to the accident alleged. In fact this whole case, from the recitals in the original peti-

tion down to the end of the trial, the apparent conflict between known physical laws and plaintiff's own conduct, the failure to bring forward testimony and produce witnesses on the part of plaintiff, without any explanation of that failure, along with refusal to instruct on what we consider a vital issue, all contribute to render us so very doubtful of the righteousness and correctness of the verdict that we are unwilling to let it stand. It is accordingly set aside, the judgment reversed and the cause remanded. All concur.