ELIZABETH WHITMORE, Respondent, v. THE AMERICAN RAILWAY EXPRESS COMPANY, and J. HOWARD BARNES, Appellants.*

Kansas City Court of Appeals. March 2, 1925.

1. MASTER AND SERVANT: Independent Contractor: Owner of Truck Hauling and Delivering Goods for Express Company Held Servant of Company and Not Independent Contractor. Under section 10089, Revised Statutes 1919, express companies being common carriers, their duty involves the continuous custody of goods from time of reception to final delivery to consignee, there was no merit in defendant express company's contention that owner of truck contracting to haul and deliver goods shipped and received by defendant was an independent contract and not servant of defendant.

2. NEGLIGENCE: Evidence Held Sufficient to Justify Jury in Finding That Something on Truck Struck Deceased and Caused Him to Fall.

In action for death of plaintiff's husband alleged to have been caused by truck of defendant striking him, *held* under evidence jury could reasonably say that something on truck·must have struck deceased and caused him to fall.

3. EVIDENCE: Where Party Fails to Produce or Suppresses Evidence Within His Knowledge, an Inference Arises That Such Evidence, if Produced, Would be Unfavorable to Him. *Where a party fails to produce, or suppresses, evidence which is within his knowledge and power to produce, and which he would naturally produce if it were favorable to him, gives rise to an inference that production of such evidence would be unfavorable to him.*

4. ————: Failure of Party to Call Witness Possessing Knowledge of Facts Essential to Case Gives Rise to Inference That Testimony of Witness Would Not Sustain His Contention. *Failure of party to call an available witness possessing peculiar knowledge, concerning. facts essential to his case, especially if witness would naturally be favorable to his contention and relying instead upon evidence of witness less familiar with matter, gives rise to an inference that testimony of such uninterrogated witness would not sustain contention of party.*

5. ————: Failure to Produce Physicians Who Attended Deceased Gives Rise to Presumption That Their Evidence Would Disprove Allegation That Death Was Caused by Alleged Injury. *In action for death of plaintiff's husband claimed to have been struck by truck, held testimony of physicians and surgeons who attended deceased, if they had been introduced, would have tended to disprove allegation that his death was caused by alleged injury, particularly where defendants were unable to produce such evidence.*

6. ————: Statement of Driver of Truck Held Not Part of Res Gestae and Inadmissible as Hearsay. *Statement of defendant's truck driver that after deceased was said to have been struck, he heard deceased tell express company's agent that he was struck by tire, held inadmissible as part of res gestae and hearsay.*

---

*Corpus Juris-Cyc. References; Carriers, 10 C. J., p. 48, n. 27. Evidence, 22 C. J., p. 111, n. 51, 52, 53, 54; p. 115, n. 85, 86; p. 116, n. 87, 91, 92; p. 124, n. 47; p. 199, n. 36. Master and Servant, 39 C. J., p. 1336, n. 46. Motor Vehicles, 28 Cyc., p. 46 n. 27. Negligence, 29 Cyc., p. 624, n. 19.

Appeal from the Circuit Court of Davies County.—
*Hon. Arch B. Davis,* Judge.

REVERSED AND REMANDED.

*Pross T. Cross* and *C. E. Ernst* for respondent.

*Lathrop, Morrow, Fox & Moore, Geo. J. Mersereau* and *Richard S. Righter* for appellant Express Company.

ARNOLD, J.—This is an action in damages for the death of plaintiff's husband alleged to have been caused by negligence of defendants.

The record shows the alleged injury occurred October 11, 1922, at about noon in the city of Albany, Gentry County, Missouri. There is a public square near the center of the town with the courthouse located in the center and streets on the four sides thereof. South of the square and near its center is located the office of defendant Express Company, the street in front thereof running east and west. The station of the Chicago, Burlington & Quincy Railroad Company, over whose lines the defendant express company operates, is located near the southwest city limits and about three-fourths of a mile from the Express Company's office.

Defendant Barnes, nineteen years of age, owned and operated a Ford truck, and under contract with the express company, he hauled and delivered goods shipped and received by said company between its office and the railroad station, for which he received a monthly stipend of $65. He also held a contract with the U. S. Government for hauling mail between the post office and the railroad station. He also hauled baggage and other articles for the public for hire.

On the day of the alleged accident, Barnes had gone with his truck to the railroad station to receive and deliver mail and express incident to the arrival of a train. Among other articles loaded upon his truck were some automobile tires, some of which he hung upon the standards on the right-hand side of the truck, presumably for lack of room inside. First he delivered the mail to the

post office at the northeast corner of the square; thence returning to the office of the Express Company, proceeding west along the north side of the square, thence south along the west side thereof to the southwest corner, turning east along Wood street, the truck traveling near the sidewalk as it proceeded eastward toward said office.

About this time Marshall M. Whitmore (the deceased), with his son Harry, had gone into the drug store of C. E. Littlewood, the third door west of the express office. Leaving the drug store, Whitmore and his son went to a meat market just east of the drug store. As they emerged from the meat market the elder Whitmore carried some packages under his right arm; they stopped at or near the curb, the father being upon the outside near the curb, facing eastward. While thus standing, and as the truck driven by Barnes passed them, the elder Whitmore fell upon his right arm on the sidewalk. The truck proceeded eastward probably forty feet and stopped in front of the express office. Whitmore arose, or was assisted to arise. When Barnes got down from the truck he said to Whitmore, "I'm sorry that I hit you. Are you much hurt?" or, "I'm sorry if I hit you. Are you much hurt?" There is some conflict as to which expression was used, to which Whitmore replied, "I don't know how bad I'm hurt."

It is in evidence that immediately, or very soon, aftter the accident, Whitmore went to the office of one Dr. Hartsock, an osteopathic physician in Albany. No member of his family accompanied him, but one of his sons and a brother went with him to the foot of the stairs leading to the doctor's office. On leaving there, Whitmore went to the office of a Dr. Kling, a dentist, for the purpose of having an X-ray picture made, but whether this was in any way connected with the alleged injury does not appear.

Further it is shown by the evidence that some two or three weeks after the accident Whitmore's arm was placed in a cast and so remained for a number of weeks;

that about January 2, 1923, accompanied by Dr. Hartsock he went to a hospital in St. Joseph, Mo., where an operation was performed, the nature of which is not disclosed. The testimony shows that a Doctor Weed, or Wade, performed the operation and that a Dr. Wetzel of St. Joseph had some connection with the case. Whitmore remained in the hospital for two or three weeks and after his return home he continued to suffer from some stomach trouble and was unable to eat solid food up to the time of his death, which occurred April 7, 1923.

Plaintiff testified that her husband was attacked with vomiting within two or three days after the accident and that during such attack he threw up clots of blood. She also testified that about three or four days after the accident she saw a bruised spot on his stomach about the size of a dollar. The evidence shows that after the accident, and prior to the operation, Whitmore occasionally received treatment from Dr. Hartsock for his arm. There is no evidence of any treatment for the bruise on his stomach described in plaintiff's testimony. It is shown that he took no medicine after the accident until just a short time prior to his death. After his return from St. Joseph, he was visited once by Dr. Hartsock and that shortly before his death, a Dr. Crockett of Salisbury, Missouri visited him once and administered some medicine.

The petition recites that on October 11, 1922, while said Whitmore was upon the sidewalk in said city, and in the exercise of ordinary care and caution for his own safety, the defendant, acting through its agent and servant, J. Howard Barnes, unskillfully, carelessly and negligently operated said motor truck and the load thereof so as to strike said Whitmore; that the said truck was being operated at a high, negligent and dangerous rate of speed and without giving warning of the approach of said motor truck, when they saw, or in the exercise of ordinary care could have seen the said Whitmore upon the sidewalk in a position of imminent peril and obliv-

ious thereto, in time to have enabled them, by the exercise of ordinary care to have warned said Whitmore of the approach of said truck, or to have stopped or swerved the same to one side and thereby have avoided striking him; but that defendants carelessly, negligently and unskillfully drove and operated said truck against, upon and over said Marshall N. Whitmore; that he was "struck with great force and violence by the motor truck and the load thereof and articles thereon and was knocked to the ground and to the sidewalk, then and thereby injuring him, from which injuries so received he languished and died on the 7th day of April, 1923."

The separate answer of each defendant was a general denial and a plea of contributory negligence on the part of plaintiff's husband. The reply was a general denial. Upon the issues thus made the cause went to trial to a jury in the circuit court of Davies county, where it had been taken on change of venue.

At the close of plaintiff's case in chief, each defendant offered a separate general demurrer. When these were overruled the defendants offered no evidence and the case went to the jury. It returned a verdict of $6,000 against both defendants and they both appealed.

In view of the fact that Express Companies are common carriers (indeed declared by statute to be such, section 10089, Revised Statutes 1919), and their duty involves the continuous custody of goods received from the time of such reception to their final delivery to consignee, we see no merit in defendant's contention that Barnes was an independent contractor and not the servant of the Express Company. [10 C. J. 48, sec. 24, D; Downs v. Pacific Express Co., 135 Mo. 330.]

Appellants contend that both the demurrers should have been sustained, because: (1) There was no evidence that deceased was struck and the physical facts show that his fall could not have been caused that way. (2) There was no evidence that Whitmore was injured at the time he fell; no evidence of the character of the

ailment of which he complained, and no evidence of the character of the ailment from which he died. (3) Plaintiff carefully · suppressed any evidence of the case or character of deceased's lingering illness or of his death. (4) Plaintiff suppressed and withheld available evidence of the character of deceased's injuries and ailment, whence arises the presumption that this evidence would not have supported the charge that the striking caused his death. Wherefore defendants say, not only did the proof fail to disclose that deceased was struck, but that in view of the absence of evidence as to what was the nature and character of the ailment from which he suffered and of which he died, and the refusal of the plaintiff to allow the facts in that regard to be shown, the jury's finding was based on a mere guess or conjecture.

We think there was substantial evidence to enable the jury to say the truck struck deceased. His son was on deceased's right as the truck passed, says it passed going east in the same direction they were looking, and as it passed his father fell, his money and knife flying out of his pockets. Witness did not see truck strike his father; just the front of the truck had passed his father when the latter fell; the truck was going fast; he fell on his face.

Littlewood, sitting in the window of his drug store, when asked to tell what he saw, testified: "Gentlemen, I was sitting there in that seat and I was looking east, see, and I could not help but see the truck hit him, that is, with some tires on the outside, and knocked him down. . . . Q. Where did the truck strike him by objects hanging on the truck, if you know? A. Well, I don't know whether they struck him on the shoulder or in the back or some place else; I don't know. It was done so quick, you know, you could not hardly tell. Of course, the tires hit him. He was, Whitmore was standing facing east on the walk and when it struck him, why the tires on the outside over a standard hit him and knocked him down."

Witness on cross-examination said deceased was "right close to the edge of the walk," was looking east, was standing still when the truck hit him. Witness could not say how close in inches deceased was to the edge of the walk, but he thought he was "right on the edge of the walk," but might have been five or six inches therefrom; he didn't know, he couldn't tell. His testimony then is as follows:

"Q. Now, whereabouts on his body was he struck? A. Well, now, I don't know that. I just seen him hit and knocked down. I could not tell, see. I don't know. Either up about the shoulders, or something like that. I don't know.

"Q. Isn't it a fact, Mr. Littlewood, that you saw him fall but you didn't see him hit? A. Oh, yes, I seen both.

"Q. Where was he hit? A. Well, of course I saw, I couldn't answer that, but he was hit some place, I don't know whether below the shoulders or where it was. I don't know. The first thing I seen when the truck hit him, he just went tumbling over (illustrating), that is all.

"Q. Now, did the truck hit him? A. No, I don't think so. I don't think the truck hit him.

"Q. And do you know what hit him? A. There was some tires I noticed as they went by my place hanging on the side.

"Q. Did you see them hit him? A. Well, I seen something hit him. I don't know whether it was the tire or what it was. I think it was tires, though. I seen something hanging there on the side, on the standards.

"Q. But you can't say that it was the tire or that it was the truck, is that right? A. Well, no, I know the truck didn't hit him, because the truck, if it had it would have had to get up on the walk, see.

"Q. Well, did you see the tire hit him, then? A. Well, I seen him hit and knocked down there, and this tire was on the side as it passed me and I just happened

to look a little ahead and seen it strike him. I am satisfied in my own mind it was the tires, something on the side, because he would have had to run up on the walk with the truck, you know.

"Q. Did it hit him on the hip or on the head or on the arm or where? A. Well, listen, now. I just don't know. It hit him up some place in here from the shoulders down, or in here, see (indicating)? And I seen him fall.

"Q. Hit him on the left side, it hit him? A. Well, I expect it would be the left side, because he was looking.

"Q. Looking east. A. Looking east.

"Q. When you saw him fall? A. Yes."

. . .     . . .     . . .

"Q. Just as you got into the front of your store and sat down you saw Whitmore? A. Yes.

"Q. Standing there. At the same time the truck came up? A. Yes.

"Q. And you saw him fall? A. Yes, sir.

"Q. You cannot tell definitely what it was, what part of the truck hit him or where it hit him? A. Well, I don't know. I don't know exactly, but then I know it was something hit him there as it passed there, see, and I know that something had to hit him on the outside because the truck would have had to go on the walk to hit him.

"Q. That is your assumption about it, but you had not paid any special attention to it at all before that, had you? You made no observation either of the truck or the man? A. Why, no. I didn't know whether he had tires on there or what not."

Appellants contend that Littlejohn's testimony is thus shown to be merely his conclusion that the truck struck deceased, because he fell as it passed him. We cannot so say as a matter of law. And certainly under all the evidence the jury reasonably could say that something on the truck must have struck deceased to cause him to fall

and his knife and money to fly out of his pockets the way they did.

As to the other grounds of the demurrers, namely, that there was no evidence that Whitmore was injured, nor evidence of the character of the ailment of which he suffered, we think there is evidence that he suffered an injury to his elbow or arm, and there is evidence that he complained of being injured; and that some three or four days after the accident his wife discovered a bruised place the size of a dollar a little to the right of the center of his abdomen. There is evidence that he sustained an injury. But the important question in this case is, Was his death the result of an injury received at that time? It develops that prior to his injury he had had an attack of appendicitis but had recovered through the use of medicine without an operation and it was appellant's contention, and they endeavored to show, that he had habits of intemperance. This was offered in an effort to establish the fact that he had a chronic condition of his stomach or bowels which was likely to break out suddenly as a disease at any time, and that his trouble arose from such disease.

The objection to testimony showing deceased's habits as to intoxication for this purpose was sustained. After the operation he was treated for his arm by Dr. Hartsock, but he was not treated, nor did he seek medical advice on any other score until some months after the accident. And although there is evidence of record that he was treated by Dr. Hartsock and was operated upon in St. Joseph; that he remained at the hospital, for about two weeks; that after he was brought home he was visited professionally by Dr. Crockett who then prescribed for him, yet plaintiff did not choose to put one of these doctors upon the stand, no medical testimony being offered by her whatever. Such evidence was available to her, but any inquiry as to the nature and purpose of the treatments and of the operation was objected to

on the ground that the secrets of the sickroom would be revealed, and plaintiff's counsel would not allow plaintiff to tell on cross-examination what she had learned in that regard while in attendance upon her husband, being admonished repeatedly by her counsel, during cross-examination, to tell only what she, of her own knowledge, knew. The evidence as to the above matters was available to plaintiff but not to defendants; and they were carefully prevented from eliciting any light upon the nature, character or origin of the trouble from which plaintiff's husband died, except that hereinabove set forth and only that which might point solely to the accident as the cause was permitted to be laid before the jury. If the evidence hereinabove shown were all that was obtainable on the subject, doubtless, there would be room for the jury reasonably to find that Whitmore died as a result of his fall; but in the situation here presented where there was manifestly an opportunity for disease and not an injury, to do its deadly work and the plaintiff, although alleging that her husband died from his injury, yet refused to lift the veil which would disclose *all* the facts and let the jury decide after it has all of them, and succeeded in excluding such facts, how can the jury's conclusion be otherwise than merely a guess? The refusal to lift the veil in this regard is, in effect, a suppression of evidence as to one of the most, if not the most, vital issues in the case. And the general rule applicable to such situation is tersely stated in 22 C. J. 111, as follows: "The failure of a party to produce evidence which is within his knowledge, which he has power to produce, and which he would naturally produce if it were favorable to him, gives rise to an inference that if such evidence were produced it would be unfavorable to him; and a similar effect attends an effort to suppress evidence."

The general rule as to failure to call or examine witnesses is stated in 22 C. J. 115, as follows: "Failure of

a party to call an available witness possessing peculiar knowledge concerning facts essential to a party's case, direct or rebutting, or to examine such witness as to the facts covered by his special knowledge, especially if the witness would naturally be favorable to the party's contention, relying instead upon the evidence of witnesses less familiar with the matter, gives rise to an inference that the testimony of such uninterrogated witness would not sustain the contention of the party.''

The rule in Missouri follows the general rules above quoted, to the effect that the presumption will be indulged against the party who suppresses evidence, or fails to call available witnesses to sustain his part of the controversy. It must be concluded therefore that if the testimony of the physicians and surgeons who attended Whitmore had been introduced, it would have tended to disprove the allegation that his death was caused by the alleged injury. This question arose in the case of Thomas v. Life Assurance Society, 205 S. W. 533, and this court said: ''There is a rule of evidence which has been formulated upon the most reasonable ground, and which has the effect to prevent a failure of justice. It is that, where knowledge of a material fact lies with one party he must prove it. [Clifford v. Donovan, 195 Mo. 262, 285, 94 S. W. 527; Frame v. Sovereign Camp, 67 Mo. App. 127, 135.] The other party being unable to produce evidence of it, it will be presumed to be that which would be most advantageous to the party who cannot produce it as against him who can.''

Also see McClanahan v. Railroad, 147 Mo. App. 386, 126 S. W. 535, a case decided by the St. Louis Court of Appeals, wherein it is said: ''We are confirmed in our view that this verdict should not stand by the failure of the plaintiff to produce witnesses and offer testimony which must have been under her control and which was of the highest importance. The fact stares us in the face, that immediately after the happening of the acci-

dent, plaintiff was under the care of three physicians, selected by herself; that after having had the benefit of their assistance and advice, she not only made no mention whatever of the fractured bone when she drew up her petition, but has not seen fit to call those physicians as witnesses in her behalf. She could call them, the defendant could not. We think it was her duty to have produced their testimony or accounted for its absence.'' [See, also, Evans v. Town of Trenton, 112 Mo. 390, 403; McCord v. Schaff, 279 Mo. 558, 565; Kroell v. Lutz (Mo. App), 236 S. W. 422; Willitts v. Railroad, 221 S. W. 65, and cases therein cited.]

While there is some evidence from which the jury might have inferred that the death of plaintiff's husband was caused from the injury alleged in the petition, it is manifest that it was within the power of plaintiff to present evidence as to the ailment for which deceased was treated, for which he was operated upon, and from which he died. It is also manifest that defendants not only were unable to present this evidence, but when an attempt was made to penetrate the veil of secrecy in that respect, plaintiff objected, one of the grounds of the objection being that such attempt was an effort to invade ''the privacy of the sickroom and the operating room, disclosing information which is necessary and was obtained by a physician,'' etc., and the objection was sustained.

Furthermore, defendants, and especially the Express Company, sought to show that deceased was addicted to habits of intemperance and that by reason thereof he had a chronic condition, and that the illness of which he complained was not caused by the alleged accident, but by such chronic condition which finally caused his death. Plaintiff's objections to this offer of proof were sustained, the court ruling that whether the deceased was intoxicated at the time of the alleged injury might be shown, but not his intemperate habits.

From the very limited and restricted way in which plaintiff permitted evidence to go to the jury as to the cause of her husband's death, when all of the evidence in regard thereto was under her control, it is evident that she permitted only a partial view of these matters to reach the minds of the jury. Therefore in the very nature of things, the jury could do nothing more than conjecture that the blow alleged was the cause of his death.

· We think error was committed also in allowing plaintiff to elicit from defendant Barnes the statement that after deceased is said to have been struck, he (Barnes) heard him tell Mr. Bush, the Express Company's agent, that he was struck by the tire. This was not admissible as part of the *res gestae*, and was hearsay.

For the errors above indicated, the judgment is reversed and the cause remanded for a new trial.

All concur.