Betty Dean CRAWFORD, Respondent,

v.

Verl Leonard McNECE, Appellant.

No. 50949.

Supreme Court of Missouri,

Division No. 2.

April 12, 1965.

Briney & Welborn, Joe Welborn, James E. Spain, Bloomfield, for plaintiff-respondent.

Powell, Jones & Ringer, Dexter, for defendant-appellant.

PRITCHARD, Commissioner.

Plaintiff, Betty Dean Crawford, on February 24, 1963, was operating a Valiant

automobile on Missouri Highway 25, and at its intersection with Stoddard County, Missouri, Route AA, at which she was stopped and intending to make a left turn onto Route AA, the Valiant was struck from the rear by a Plymouth automobile owned by defendant Carl McNece, but operated by defendant Verl Leonard McNece. At the beginning of the trial, plaintiff dismissed her case as to defendant Carl McNece without prejudice.

The trial was to a jury which returned a verdict for plaintiff for $17,500 upon which judgment was entered against defendant Verl McNece, and from which he appeals.

At the point of the collision Highway 25 runs in a generally north-south direction, and as one goes north thereon it slopes slightly downward on a gradual curve to the right. It is a concrete pavement 20 feet in width with a shoulder on the east side 11 feet wide. The east edge of the pavement also has a concrete lip and just opposite of where westbound Route AA intersects is a concrete drainage sluice into which the lip of the highway directs surface water. Route AA is of a bituminous or blacktop surface, and as it intersects Highway 25 it flares out so that its greatest width next to the pavement of Highway 25 is 80 to 100 feet. Route AA leads into Bloomfield, Missouri, to the west from Highway 25. February 24, 1963, was a clear day and the highway surface was dry.

In addition to giving the foregoing physical characteristics of the scene of the collision, Highway Patrolman Vernon Hopkins testified that he investigated the collision. He arrived there at 2:15 p. m., about an hour after it happened. He observed dirt and debris in the northbound lane of Highway 25, nine feet south from where the north edge of Route AA meets the west edge of Highway 25. There were skid marks on the concrete pavement starting at a point about 40 feet south of where the dirt and debris were and continuing

north and angling toward the east. From the point of impact (location of dirt and debris) one can see to the south 800 to 1,000 feet. Trooper Hopkins made a test of the signal and brake lights on the rear of the Valiant and found that they were working, but that they were covered with dirt and road film. He could, however, see the lights through the road film. He testified further that the normal stopping distance of a 1960 Valiant automobile at a speed of 20 miles per hour is about 45 feet, and at 20 to 25 miles around 50 to 55 feet. For a 1961 Plymouth the average stopping distance at 35 miles per hour would be: excellent, 92½ feet; good, 101 feet; and fair, 120 feet, including reaction time.

Mr. and Mrs. Shelton Baker were eyewitnesses to the collision. They were approaching from the north in a pickup truck, and saw the Valiant car stopped in the northbound lane at the intersection with the front left signal light on and blinking. Just as the pickup got even with the Valiant, another car struck the Valiant in the rear, and they both saw plaintiff's head snap back. The Bakers went on for about ¼ mile to the County Farm on Highway 25, turned around there and came back. The Valiant was then on the right shoulder of Highway 25 opposite Route AA, and Mr. Baker observed that its tail lights were dirty and covered with road film.

Plaintiff testified that she was 24 years old and a legal secretary to Mr. Roger Bailey of Sikeston, Missouri, where she resided. On the day of the collision, a Sunday, she was driving alone to her parents' home west of Bloomfield, and was driving north on Highway 25 initially at a speed of around 55 miles per hour. For several miles prior to the collision she saw a white vehicle following her. As she approached the intersection of the two highways, and when she was about 200 yards to the south thereof, she turned on her signal light for a left-hand turn. The green arrow on the panel was blinking,

indicating that the signal light was operating. She gradually slowed down to about 35 miles per hour, and then slowed more— 15 to 25 miles per hour, and when she was 35 to 50 feet away from where she was going to stop to allow some southbound cars to pass her, she put on her brakes and came to a stop in the northbound lane with the front of her car about a foot or so north of the center line dividing Route AA. As she was stopped, plaintiff heard a screeching of brakes, she looked in her rear-view mirror and saw the following white car right upon her, and it hit her. Plaintiff's neck was jerked backwards, then forward, and she was dazed and blinded. She thought her car was going out of control, and knowing there were cars coming from the north, she jerked her steering wheel to the right to avoid hitting them. Her car came to a rest on the right shoulder of the road about four or so car lengths away from the point of impact. At 20–25 miles per hour, plaintiff's estimated speed, it would take her three or so car lengths to stop. Her vehicle was about 16 feet in length.

Defendant Verl McNece, the driver of the Plymouth car, was enroute to St Louis from Bernie, Missouri. As he passed the County Farm south of Bloomfield (about ¼ mile from the scene of the collision) he noticed plaintiff's vehicle. He was then following it 150 to 200 yards to its south. Plaintiff's speed was then about 35 miles per hour, as was McNece's speed. McNece continued to trail plaintiff up to the time of the accident. After entering the city limits, the speeds of the two vehicles were slowed to about 25 miles per hour, and McNece was following plaintiff two and a half to three car lengths (about 48 feet). He testified as he was following her, all of a sudden she threw on her brakes and stopped; and as soon as he could see that plaintiff was stopped, he "slammed" on his brakes too, and tried to stop. He could not go left because a pickup truck right even with them was going south, and he could not go right because a culvert (highway surface drain) was on the right-hand side. McNece testified further that he saw no signal of any kind from plaintiff's car.

Witness Roy Woods and his wife were riding in the back seat of the McNece Plymouth. Mr. Woods testified he saw the Valiant car stopped in the middle of the highway when the Plymouth was about three car lengths behind. He saw no stop or turn signal on the Valiant. He did not think plaintiff skidded her wheels in order to stop. He testified that when the dirt was wiped off of the rear signal lights they could be seen better; and that before they were wiped off he could barely see them from 3 to 4 feet back, but he didn't go farther away to see how far away the lights could be seen.

Defendant's first point is that the court should have directed a verdict for him because plaintiff was contributorily negligent as a matter of law in that her "uncontradicted evidence shows that no emergency existed requiring plaintiff to stop suddenly and that plaintiff did stop her motor vehicle suddenly on said highway without visible, timely and adequate signal to, and, in disregard of and while failing to keep a lookout for defendant's closely following vehicle."

Plaintiff submitted her case to the jury in Instruction No. P–1 upon the rear end doctrine of this state: " * * * [T]he doctrine or rule of law which recognizes that if one person has his vehicle in a portion of the highway where he should have it or is entitled to have it in view of the course in which he is proceeding, and some other person traveling behind him in the same direction overtakes him and permits his vehicle to run into the rear of the one ahead, the proof of a collision under such circumstances makes out a prima facie case of specific negligence against such other person in charge of the overtaking vehicle." Hughes v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 360, 362 [3]; Jones v. Central States Oil Co., 350 Mo. 91, 164 S.W.2d 914, 917 [2].

The fallacy of defendant's argument is that the evidence does not conclusively show that plaintiff stopped suddenly, or that she stopped without visible, timely or adequate signal. Defendant's own testimony was that as plaintiff approached the intersection and when about 200 yards therefrom she slowed *gradually* from her previous speed of about 55 miles per hour to 35 then to 25 miles per hour. Plaintiff's testimony was that she continued to slow until she was going 15 to 25 miles per hour, and when she was 35 to 50 feet away from where she was going to stop to allow northbound vehicles to pass her, she put on her brakes and came to a stop in her proper southbound lane, at which time defendant struck her car from the rear. Although defendant testified that plaintiff stopped suddenly without visible signal, his testimony was that prior to the stop both vehicles slowed gradually to about 25 miles per hour. Although defendant testified he could not see a stop or turn light signal, and there was testimony that dirt and road film were on the tail lights, the Trooper testified he could still see through it before it was cleaned, and the signal lights were working. Under plaintiff's evidence her *movement* in gradually slowing her vehicle did not convict her of contributory negligence. The space which she consumed in stopping after applying her brakes does not appear to be extraordinarily short under the evidence of *normal* stopping distances at her speed. There is nothing in this case to show as a matter of law that plaintiff's use of the road in slowing and stopping was unreasonable, or that there was any fact about the following vehicle which would impose a duty on her as a matter of law to maintain a vigilant lookout to her rear. Plaintiff was entitled to assume that defendant would keep his vehicle under such control as not to interfere with her free use of the lane in which she was travelling to make a lawful and safe left turn. 60 C.J.S. Motor Vehicles § 322, p. 744. All of these questions were for the jury to determine under all of the evidence. It is only where the evidence and inferences therefrom are such that reasonable minds could reach only one conclusion that a verdict should be directed. Zumault v. Wabash Railroad Company, Mo., 302 S.W.2d 861, 862 [2]; Harrison v. Weisbrod, Mo.App., 358 S.W.2d 277, 284 [8–10].

We have examined each of the cases cited by defendant under his Point I, and none of them is in point upon the facts of this case. Defendant's theory that plaintiff was contributorily negligent in bringing her vehicle to a sudden and abrupt stop, and in failing to give a timely signal of her intention to stop, was submitted to the jury for a finding in defendant's Instruction No. D–5. Instruction No. D–3 submitted these same acts as a sole cause of the collision for a finding exonerating defendant. There was no error in not directing a verdict for defendant. Point I is overruled.

Defendant says in Point II–A that plaintiff's Instruction No. P–1, in its submission that plaintiff's Valiant automobile was stopped in the northbound lane of the highway near the intersection "with its electric signal flashing for a left turn," was confusing and in conflict with Instruction No. D–5, and ignored the "uncontradicted" evidence that the tail light of plaintiff's automobile was "dirty and covered with road film." He says that the instruction unduly and unfairly emphasized evidence that the front turn signal was visible to witness Shelton Baker meeting plaintiff's vehicle and that plaintiff turned on her left turn signal and saw a green light on her dash. The contention is further that the instruction ignored the essential fact issue of whether an effective rear left turn signal was visible to defendant.

There was uncontradicted evidence that the tail lights on plaintiff's Valiant were dirty and covered with road film. The testimony of Trooper Hopkins was that the lights were working, and although dirty he could see through such dirt and film. Under the facts and circumstances

it was for the jury to determine if the signal lights were visible under defendant's Instruction No. D–5. Plaintiff was not required to hypothesize this defensive matter (i. e., that the signal lights were dirty and inadequate) in her verdict directing instruction. Glowczwski v. Foster, infra.

Witness Shelton Baker did testify that he saw the front left turn signal light on plaintiff's vehicle as he approached it. Plaintiff's instruction did not mention the front light specifically. As it related to defendant's negligence in colliding with the rear of plaintiff's vehicle the reference to flashing left turn signal could only have meant the rear signal, and the jury could not have been misled. Plaintiff's testimony that her inside green indicator was flashing is merely corroborative of the Trooper's testimony that her rear turn signals (and stop lights) were working, but she did not submit that fact in the instruction.

Plaintiff's Instruction No. 1 properly submitted the essential facts for finding under the above-defined rear end doctrine of this state. She was not required to submit more, and her instruction properly negatived her own contributory negligence under Moore v. Ready Mixed Concrete Company, Mo., 329 S.W.2d 14. In Glowczwski v. Foster, Mo.App., 359 S. W.2d 406, 410 [5], it is said, "A plaintiff's verdict directing instruction properly hypothesizing his affirmative facts and theory of recovery is not erroneous in omitting reference to or ignoring the defendant's evidence which merely tends to disprove the plaintiff's affirmative allegations and evidence." Point II–A is overruled.

For his Point II–B defendant cites Doggendorf v. St. Louis Public Service Company, Mo.App., 333 S.W.2d 302, which held it was error to omit from a rear end doctrine instruction the sharply disputed fact of how long the plaintiff had been stopped. Defendant argues that such fact was sharply disputed here. Such is not the case. The only thing disputed was whether plaintiff made a gradual or a sudden stop. That fact was submitted to the jury in Instruction No. D–5 as a defense. The time that plaintiff was stopped is not an issue.

Under Point II–C defendant again brings up his contention that plaintiff's verdict directing Instruction No. P–1 erroneously omitted the issue of whether the signal light, if given, was timely and visible to defendant, stating that there was removed from the jury's consideration the uncontradicted testimony that the signal light could not be seen until it was wiped off. That such evidence was not uncontradicted is above ruled. Defendant, however, introduces a new contention here. It is said that plaintiff's testimony that the Valiant was owned by her husband introduced the element of a non-negligent act as being the cause of the collision, i. e., that plaintiff's husband was responsible for the dirty and road film covered tail lights. Plaintiff was in charge of the Valiant as an operator. There was no evidence that her husband had control over the automobile. It was her responsibility to see that it was in proper functioning condition, including seeing that the rear signal lights were clean. Plaintiff made no attempt to fasten any responsibility for the condition of the automobile's tail lights upon her husband. She does not concede that such signal lights were dirty to the extent that it was conclusive that a signal could not be seen. As stated in Glowczwski, supra, such fact was a defensive matter. Branch v. Gordon's Transports, Inc., Mo.App., 375 S. W.2d 418, where an instruction was condemned which ignored skidding, which fact was adduced by plaintiff there, as a non-negligent cause exonerating defendant, is inapplicable. The contention is without merit. Point II–C is overruled.

Defendant claims by Point III that he is entitled to a new trial by reason of the failure of plaintiff to call as witnesses her

medical doctors who saw her and treated her after the collision. This fact, says the defendant, permitted the jury to arrive at its verdict by conjecture and such verdict was not based upon substantial evidence in that the jury was permitted only a partial view of evidence bearing upon the nature and extent of plaintiff's injury.

The evidence bearing upon this question is that on the afternoon of the collision plaintiff entered the Missouri Delta Community Hospital in Sikeston, where she remained for six days. A member of the staff of that hospital, Dr. Wilson Ferguson, M.D., saw plaintiff initially, and according to entries in her hospital record (which was admitted in evidence) he diagnosed her injuries as a sprain of the cervical muscles, and a contusion of the larynx with swelling and discoloration. On February 25, the doctor recorded that plaintiff's neck was still tender, and she had soreness in both shoulders, and some pain along the extension of the forearm muscle. On February 27, the doctor recorded that plaintiff still had much neck pain; the larynx was much improved. Plaintiff was discharged in a wheelchair on March 1, 1963, and went home where she was in bed a week taking medication, and using a heating pad and hot towels on her neck. She went back to her secretarial work about 2½ weeks after the collision, but did not resume her normal duties, but sat around and used a cot in the back room. Dr. Ferguson gave her a collar and traction set to use at home. In about two weeks plaintiff developed pain in her low back and her left leg and foot. She wore a sacrum belt for eight or nine months.

About two and a half weeks after the collision she went to see Dr. Robert B. Bennett, a Chiropractor. He treated her with deep heat and traction, and she continued to see him until July, 1963. Plaintiff also took treatment from the therapist in the Ferguson Clinic, consisting of hot packs and ultra-sonic heat. At the time of trial, plaintiff's back, hip and foot still bothered her, her neck was still stiff and sore and she had difficulty sleeping. Prior to the collision plaintiff had none of these symptoms. Plaintiff also saw Dr. Frank Tull, M.D., an Orthopedist, in August or September, after Dr. Ferguson ended his treatment in July, 1963. She also saw a Dr. Otto in Cape Girardeau.

Dr. Robert B. Bennett, Chiropractor, was the only medical witness who testified. He treated plaintiff from March 12, 1963, on forty-two occasions. His examinations and findings indicated that plaintiff's injuries were in the muscle and not in the bone, and his diagnosis was a strain in cervical area of plaintiff's neck, soft tissue only; the sciatic nerve was involved in both legs, affecting her with pain and lack of motion due to pain. His treatment consisted of chiropractic management, a brace for the lower part of the back, heat physiotherapy, and cervical traction. Plaintiff was relieved by the treatments, but not cured. Her injuries were permanent— 10% "whole man impairment," based upon a 14% functional ability impairment of different areas of her body. In answer to a hypothetical question, Dr. Bennett testified further that in his opinion plaintiff's injuries which he described certainly could have been caused by the automobile collision. Dr. Bennett concluded his treatment of plaintiff on July 21, 1963, but examined her again on March 17, 1964, for the purpose of testifying.

On the hearing of the motion for new trial it was conceded by counsel for plaintiff that subpoenas were issued for Doctors Tull and Ferguson, delivered to plaintiff's counsel but were not served. It was admitted by counsel for defendant that many months before trial they received a signed authorization from plaintiff to consult with her doctors, and they did receive a copy of the medical report concerning plaintiff's injuries.

Defendant did not have plaintiff examined medically as was his right under Civil Rule 60.01, V.A.M.R.

Considering all of the evidence upon plaintiff's injuries—witnesses Mr. and Mrs. Baker who saw her head snap back upon the collision; plaintiff herself, her hospital record; and Dr. Bennett, whose qualification as a medical witness and to give a medical opinion stands unchallenged —we do not consider that there was unsubstantial evidence for the jury to find the nature and extent of such injuries—a cervical sprain and a low back injury all involving tissue, but with permanency to the extent testified to by Dr. Bennett. Nor was the jury required to conjecture as to the nature and extent of the injuries.

It does not appear why the issued subpoenas were not served upon Doctors Tull and Ferguson. Plaintiff, however, was not required to call them as witnesses in her behalf if she chose, as apparently she did, to run the risk of the strong presumption that their testimony would be unfavorable. Block v. Rackers, Mo., 256 S.W.2d 760, 764; Williams v. Ricklemann, Mo., 292 S.W.2d 276, 283 [12, 13]. There is no evidence in this record that plaintiff wrongfully concealed or suppressed evidence which fact would have been admissible as showing an admission that she (or her counsel) was conscious of being in the wrong and that her cause was unjust under State of Missouri ex rel. St. Louis County Transit Company v. Walsh, Mo.App., 327 S.W.2d 713, 717.

Defendant cites Spaeth v. Larkin, Mo., 325 S.W.2d 767; Whitmore v. American Ry. Express Co., 219 Mo.App. 294, 269 S.W. 654; and McClanahan v. St. Louis & S. F. R. Co., 147 Mo.App. 386, 126 S.W. 535, in support of his contention that he is entitled to a new trial because of the absence of the testimony of the two medical doctors of plaintiff. In Spaeth, an action to set aside a deed (*reviewable de novo*) on the ground, among others, of mental incapacity of the grantor, the court applied the unfavorable inference which attached to the failure of plaintiffs to offer themselves as witnesses on the issue of mental capacity. In Whitmore, a judgment for plaintiff was reversed and remanded because the *only* medical witnesses who could establish that deceased's death was caused by being struck by a truck did not testify. In the McClanahan case, the court was unwilling to say that there was no substantial evidence to sustain the verdict, but did reverse and remand the case because plaintiff failed to call witnesses to prove that the injury was solely and directly traceable to the accident alleged. There were also conflicts between plaintiff's conduct and known physical laws. No facts are in this case which are comparable to those of the foregoing cases. There was substantial evidence of the nature and extent of plaintiff's injuries as stated, and there exists only the unfavorable inference against the *credibility* of her case, an issue for the jury. See Transamerican Freight Lines v. Monark Egg Corp., 236 Mo.App. 1047, 161 S.W.2d 687, 690 [2–4].

Furthermore, defendant had full opportunity to have plaintiff medically examined and to present thereby to the jury any testimony contrary to that of Dr. Bennett concerning the nature and extent of plaintiff's injuries. This he did not do, and therefore he may not now be heard to complain of any weakness of plaintiff's medical witnesses and evidence to support the verdict.

Defendant made no allegation in his motion for new trial that the verdict in itself is excessive. The allegation, "The verdict is so excessive as to indicate passion and prejudice on the part of the jury," does not present the issue of excessiveness under the rule of uniformity of verdicts whereby a remittitur may be made. Skadal v. Brown, Mo., 351 S.W.2d 684, 689 [12–14]; Brown v. Kroger Company, Mo.App., 358 S.W.2d 429, 435 [11, 12]. There is no evidence in this case of any misconduct engendered during the course of the trial as to indicate the verdict was the result of bias and prejudice. We will not infer bias and prejudice because of the size of

this verdict, although it is quite liberal under the evidence. Defendant's allegation that the verdict is against the weight of the evidence is insufficient to raise the question of the excessiveness thereof. Johnson v. Flex-O-Lite Manufacturing Corporation, Mo., 314 S.W.2d 75, 85 [14]. Defendant's Point III is overruled.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.